**Herman Ray WHITFIELD, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 14–15–00820–CR**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed March 9, 2017.

Discretionary Review Refused June 28, 2017

---

Jani J. Maselli Wood, Houston, TX, for Appellant.

Eric Kugler, Houston, TX, for State.

Panel consists of Chief Justice Frost, Justice Brown, and Justice Jewell.

## OPINION

Marc W. Brown, Justice

Appellant Herman Ray Whitfield was convicted by a jury of aggravated sexual assault. *See* Tex. Pen. Code § 22.021(a)(2)(A)(iv) (West 2015). Appellant elected to have the trial court assess his punishment and pleaded true to the two felony enhancements alleged in his indictment. The trial court sentenced him to confinement for life. Appellant filed a motion for new trial, which the trial court denied after a hearing.

Appellant raises two issues. First, he argues that the trial court should have sustained his objections based on his Sixth Amendment right to confrontation and *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), under circumstances where the State presented an expert DNA analyst who testified regarding her DNA comparison results instead of presenting all the technicians involved in the DNA testing process. Second, appellant contends that the State's actions related to posting on social media about his trial were so egregious that they amounted to a denial of due process. We affirm.

## I. BACKGROUND

Trial evidence showed that on June 11, 2008, J.B., a high school student, took a bus over to her best friend's apartment in the Sunnyside area of Houston, Texas. They hung out for a few hours. After J.B.'s mother called her to return home, J.B. left the apartment. While J.B. was walking along a trail back to her bus stop, a man grabbed her and put a pocket knife to her neck. The man had dark skin, wore sunglasses and a baseball cap, and appeared to be in his 30's or 40's. The man forced J.B. under barbed wire fencing into the nearby grassy woods and slammed her body onto the ground, face down. The man forced down J.B.'s shorts and sexually assaulted her, then ran away, leaving J.B. in the grassy woods.

J.B.—shoeless, crying, shaking, scratched, and disheveled—returned to her friend's apartment. Her friend called 9–1–1 to report what had happened. HPD Officer Chillis responded. Chillis and J.B. returned to the grassy woods, where they located J.B.'s shoes. J.B. then was transported to the hospital, where she was examined by a sexual assault nurse examiner. The nurse examiner collected evidence from J.B., including the articles of clothing worn during the attack and a buccal swab from the inside of J.B.'s mouth. HPD Officer Landrum collected this evidence from the hospital. The investigation was assigned to HPD Officer McMurtry. McMurtry obtained J.B.'s statement, and a description of the suspect was released to the public.

Starting in 2010, the HPD Crime Lab[1] began working through a large backlog of rape kits and evidence that needed to be tested for DNA, including evidence from J.B.'s case. In 2013, HPD Officer Whitlock became involved with the investigation. Whitlock obtained a search warrant for appellant's DNA and collected a buccal swab from him. Appellant was ultimately charged with the aggravated sexual assault of J.B. Appellant's indictment also alleged two prior felony convictions.

At trial, the State presented expert testimony from Lloyd Halsell and Amy Castillo regarding the DNA testing conducted in this case. Both Halsell and Castillo testified that at the HPD Crime Lab, DNA testing is conducted in an assembly-line or

1. In 2014, the HPD Crime Lab was renamed the Houston Forensic Science Center.

batch process. At the time, Halsell was a DNA analyst and supervisor at the HPD Crime Lab. He testified that, at the lab, technicians extracted, quantified, and amplified DNA from appellant's buccal swab. A portion of this amplified DNA was inserted into a lab instrument for analysis. The instrument "separate[d] out and visualize[d] the data," generating a known DNA profile for appellant. Halsell explained how positive and negative controls, as well as flushing protocols, are used to ensure that the instrument is not subject to cross-contamination among samples. Halsell further explained that the DNA profile consists of numerical code data on 15 individual short tandem repeat locations plus a sex-determining marker. The DNA profile or allele chart is unique to each individual except for identical twins. Halsell interpreted the DNA profile generated from appellant's buccal swab and determined that it reflected a complete male DNA profile from one known individual. According to Halsell, once DNA profiles are generated from known references, they can be compared to DNA profiles generated from evidentiary items.[2]

At the time, Castillo also was a DNA analyst and supervisor at the HPD Crime Lab. Castillo testified that lab technicians performed DNA extraction, quantification, amplification, and separation from the buccal swab in J.B.'s rape kit, generating a known DNA profile for the victim J.B. In addition, evidence from J.B.'s rape kit and the clothing collected from J.B. were screened for potential body fluids. They tested negative for semen. However, lab technicians were able to extract, quantify, amplify, and separate out DNA from a bloodstain on J.B.'s shorts, generating an unknown DNA profile.

During Castillo's testimony, appellant's counsel raised various objections based on a "Sixth Amendment *Bullcoming, Melendez–Diaz [v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009)], and *Crawford [v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)] issue."[3] The trial court overruled these objections.

Castillo interpreted the known DNA profile generated from J.B.'s buccal swab and determined that it was a full DNA profile from a female single source. Castillo also interpreted the unknown DNA profile and determined that it was a full DNA profile from a male single source. As a result, Castillo was able to eliminate J.B. as the contributor of the blood on her shorts. Castillo then compared the allele charts for appellant's known DNA profile and for the unknown male DNA profile and determined that they were the same. Castillo concluded that appellant could not be excluded as the source:

> The conclusion that we drew on that comparison is that Herman Whitfield cannot be excluded as a possible contributor to the profile from that item. We then do statistics to show the odds that another random individual could be included as a contributor to that profile,

---

**2.** Halsell testified that he did not perform the DNA extraction, quantification, amplification, and separation from appellant's buccal swab. Appellant did not object to Halsell's testifying or to the admission of the allele chart generated from appellant's buccal swab.

**3.** Appellant objected to Castillo's testifying regarding the testing that other lab personnel performed on J.B.'s buccal swab and on the cutting from J.B.'s shorts. Appellant also objected to admission of the allele chart generated from these items: "So, I want to make this clear that our objection to State's 86 is that the results are based upon evidence that was admitted over our objection that we believe is inadmissible." Finally, appellant objected to the admission of photographic images of the shorts, shirt, and underwear contained in the lab report, which images depicted the physical items of evidence collected from J.B. that already had been admitted.

and what was calculated was 1 in 310 quintillion for Caucasian, 1 in 1.5 sextillion for African Americans, and 1 in 130 sextillion for southwest Hispanics.

Castillo explained that there are 21 zeros in a sextillion versus 9 zeros in a billion. According to Castillo, based on a world population of 7.7 billion, one would have to test "multiples of the world's population" "to find somebody else to include as a contributor to that profile."

The jury returned a "guilty" verdict. Appellant elected to have the trial court instead of the jury determine his punishment. Appellant entered into a stipulation of evidence with regard to the two prior felony convictions and pleaded true to both. The trial court sentenced appellant to life in prison.

During appellant's trial, the Harris County District Attorney's Office posted about appellant on its official Facebook and Twitter pages. The Facebook post included appellant's image and described him as the "Sunnyside Rapist" "who has allegedly been tied to some 21[ ] sexual assaults in the Houston area." The Twitter post also included appellant's image and stated: "Herman Whitfield aka the sunnyside rapist is on trial this week. We are seeking justice for all his victims # trials." Appellant filed a motion for new trial, arguing that the State's use of social media violated the Texas Rules of Disciplinary Conduct, denied appellant due process, and caused an unfair trial.[4] The trial court held a hearing. During the hearing, all of the jurors testified. They confirmed that they did not see any of the posts, that social media was not discussed during deliberations, and that they based their verdict solely on the trial evidence. The trial court denied appellant's motion.

Appellant timely appealed.

---

4. During the hearing on appellant's motion for new trial, appellant further argued that

## II. Analysis

### A. The Confrontation Clause and Castillo's testimony

■ The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him. U.S. Const. amend. VI; *Crawford*, 541 U.S. at 42, 124 S.Ct. 1354; *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015), *cert. denied sub nom.*, *Peredes v. Texas*, —— U.S. ——, 136 S.Ct. 483, 193 L.Ed.2d 354 (2015). The United States Supreme Court has applied this rule to "testimonial" statements and held that such statements are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Paredes*, 462 S.W.3d at 514 (citing *Crawford*, 541 U.S. at 54, 124 S.Ct. 1354). Testimonial statements include those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* (citing *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354). We briefly consider the seminal cases involving the Confrontation Clause and forensic testing.

*Melendez–Diaz v. Massachusetts.* In *Melendez–Diaz*, the United States Supreme Court held that the admission into evidence of notarized "certificates of analysis" prepared by a state laboratory and listing the composition, quality, and weight of the narcotics at issue violated the Confrontation Clause. 557 U.S. at 309–11, 129 S.Ct. 2527. None of the testing analysts testified at trial, and there was no opportunity to cross-examine them. *Id.* The Supreme Court determined that the certifi-

---

the State's conduct violated the Texas Code of Criminal Procedure.

cates were testimonial because they were functionally equivalent to live, in-court testimony and did precisely what a witness does on direct examination. *Id.* at 310–11, 129 S.Ct. 2527. Accordingly, the reports were inadmissible without the testimony of the analysts who performed the testing and prepared the reports. *Id.* at 311, 129 S.Ct. 2527. The Court, however, refused to hold that "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Id.* at 311, 129 S.Ct. 2527 n.1.

*Bullcoming v. New Mexico.* In *Bullcoming*, the prosecutor introduced a lab report certifying that the defendant's blood-alcohol content was above the New Mexico limit for aggravated driving while intoxicated. 564 U.S. at 651, 131 S.Ct. 2705. The testing analyst who signed the report did not testify because he was on unpaid leave from the lab. *Id.* at 655, 131 S.Ct. 2705. The prosecution called a different analyst, who was familiar with general blood-alcohol-content testing procedures but did not review the other analyst's work or sign the forensic report, and the trial court admitted the report as a business record. *Id.* The Supreme Court held that the lab report was testimonial and that the "surrogate testimony" given by the non-testing analyst explaining the report did not satisfy the defendant's Confrontation Clause rights. *Id.* at 661–62, 131 S.Ct. 2705. The Court rejected the argument that the testing analyst was a "mere scrivener" who transcribed the results calculated by a machine because the testing analyst's role involved checking for human error, not just reading machine-generated raw data. *Id.* at 659–60, 131 S.Ct. 2705.

*Williams v. Illinois.* In *Williams v. Illinois*, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), a four-one-four opinion of the United States Supreme Court, a majority of the justices concluded that a forensic scientist's comparison of an unknown DNA profile generated by a private lab from semen contained in a vaginal swab from the victim to the defendant's known DNA profile from a state database did not violate the Confrontation Clause. *Paredes*, 462 S.W.3d at 515. However, as the Texas Court of Criminal Appeals observed, *Williams* has limited value as precedent and failed to provide a narrow rule. *See id.* at 516 (majority of *Williams* justices agreed that implicit admission of underlying technical statements did not violate Confrontation Clause but could not agree why).

*Burch v. State.* In *Burch v. State*, the State offered into evidence a lab report certifying that the substance tested was cocaine. 401 S.W.3d 634, 635 (Tex. Crim. App. 2013). Both the testing analyst and the reviewing supervisor signed the lab report, but the State called only the reviewer at trial. *Id.* The reviewer "basically double-checked everything," but there was no indication that she personally conducted or observed any testing. *Id.* at 635–36. The Texas Court of Criminal Appeals held that this type of surrogate testimony violates the Confrontation Clause because the reviewer had no personal knowledge that the tests were executed correctly. *Id.* at 637–38, 640.

*Paredes v. State.* In *Paredes*, the Texas Court of Criminal Appeals considered a Confrontation Clause challenge to the admission of DNA analysis of a bloodstain on the defendant's shirt.[5] The State called the

---

**5.** Our court originally affirmed the defendant's conviction. However, the Texas Court of Criminal Appeals vacated and remanded for us to reconsider the case in light of *Burch*.

*Paredes v. State*, 14–10–00266–CR, 2011 WL 3667839, at *10 (Tex. App–Houston [14th Dist.] Aug. 23, 2011), *vacated*, No. PD-1420-

forensic lab director to testify about the DNA analysis in the defendant's case. 462 S.W.3d at 512. The raw DNA data the director relied upon in reaching her conclusion was generated by three other analysts in an assembly-line batch process. *Id.* The three other analysts were not called to testify. *Id.* at 513. The director did not physically watch the testing process but had personal knowledge of the tests used and oversaw the process. *Id.* at 512. She also provided details about the lab's safety protocols to identify process errors. *Id.* She conducted the final analysis comparing the produced DNA profiles to the evidence and performed the "crucial analysis" determining the DNA match that the victim's DNA profile matched the DNA profile from the bloodstain on the defendant's shirt. *Id.* at 512–13. Therefore, the conclusion to which she testified at trial was her own. *Id.* at 515. The raw DNA data merely provided the basis for the opinion she had developed. *Id.* at 514. Her testimony was not used as a substitute for out-of-court testimony. *See id.* Instead, "the testifying director was more than a surrogate for a non-testifying analyst's report." *Id.* at 518. "Without [the director's] independent analysis, the DNA profiles—the raw, computer-generated data ... stand for nothing ...." *Id.* at 519. Because the testifying director "used non-testimonial information—computer-generated DNA data—to form an independent, testimonial opinion" and the defendant was given the opportunity to cross-examine her about her analysis, no Confrontation Clause violation existed. *Id.*

■ In his first issue, appellant contends that "the State chose to call the one witness who did not take ownership of the testing and merely reviewed a check list," i.e., Castillo. Appellant argues that the trial court erred in overruling his repeated objections during Castillo's testimony based on the Sixth Amendment right to confrontation and *Bullcoming*.[6] Appellant asserts that the State instead should have been required "to call the four witnesses who actually did the DNA testing," i.e., Christine Konecny, who was the evidence screener on J.B.'s shorts, Juli Rufus, who verified Konecny's screening, Elizabeth Richey, who extracted the DNA from the shorts and from J.B.'s buccal swab, and Jisel Bailon, who quantified, amplified, and separated out the DNA. Appellant particularly analogizes his case to that in *Bullcoming* and *Burch* and attempts to distinguish *Paredes*.

The State responds that *Paredes* controls because, just like the expert witness there, Castillo performed the crucial analysis to determine the DNA match and testified to her own conclusions. According to the State, Castillo wrote the DNA report at the culmination of the work that had been done on the analysis of the sample on the cut-away portion of J.B.'s shorts. The State disputes that it had to call every single individual who had been involved in the analysis prior to Castillo's developing her ultimate opinions.

We cannot agree with appellant that Castillo was "merely a supervisor who 'checked the boxes' on the lab report." *See Paredes*, 462 S.W.3d at 518. Appellant's case is distinguishable from *Bullcoming* and *Burch* because Castillo was more than a mere surrogate for a non-testifying analyst's report.

---

11, 2013 WL 4507075 (Tex. Crim. App. Aug. 21, 2013). On remand, we again affirmed. *Paredes v. State,* 439 S.W.3d 522, 528 (Tex. App.–Houston [14th Dist.] 2014), *aff'd,* 462 S.W.3d 510 (Tex. Crim. App. 2015).

**6.** On appeal, appellant does not make any distinct arguments with regard to the admission of any exhibit, as opposed to essentially challenging Castillo's testimony en masse.

Similar to the lab director in *Paredes*, Castillo "performed the crucial analysis determining the DNA match and testified to her own conclusions." *See* 462 S.W.3d at 518. "Without [Castillo's] independent analysis, the DNA profiles—the raw, computer-generated data—that the ... instrument produced stand for nothing on their own." *Id.* at 519. Castillo was the analyst who interpreted the raw DNA data files or allele charts to perform her own comparison and develop her own opinions that J.B. was not the contributor of the unknown DNA from the blood on her shorts and that appellant could not be excluded as the contributor of that DNA. Castillo was the analyst who determined and testified that the odds of finding another African–American individual besides appellant to include as a contributor to that DNA profile were one in 1.5 sextillion. Like the lab director in *Paredes*, Castillo was "the person who conducted the analysis linking [appellant] to the crime." *Id.* at 514.

Nor do the circumstances in this case present the human-error problem observed in *Burch*, where the testifying witness did not conduct any analysis whatsoever and instead just reviewed the original process without any personal knowledge that the tests were done correctly. *See Paredes*, 462 S.W.3d at 518 (citing *Burch*, 401 S.W.3d at 637). Although appellant contends that Castillo disclaimed taking ownership "of any of the tests that were done," the record reflects this contention is incorrect. As in *Paredes*, even though Castillo did not "physically watch" or conduct the assembly-line or batch process DNA testing performed by the lab technicians, *see id.* at 512, Castillo testified that, when she issues her report, she "tak[es] ownership of all of that work that was done to generate those profiles for analysis." Castillo had personal knowledge of how the DNA testing was conducted at the HPD Crime Lab. *See id.* at 514, 517. Castillo explained that she has been trained in

each step of the batch process and, during her analysis, must review whether the technicians properly documented their controls and parameters—she had to "agree that they did the correct thing." She identified which particular technicians performed each step of the batch process and confirmed that these technicians still worked at the lab.

Moreover, as in *Paredes*, at issue in this case was one unknown DNA sample from a bloodstain from a single item of evidence. Castillo indicated that an evidence technician issues a report for the body-fluid screening, which report she reviews as part of her analysis. Castillo did acknowledge that she does "not take ownership of" the underlying screening report. However, Castillo explained that she personally has been trained on "the whole process," has conducted such evidence screening, and was familiar with the "cassette" test used to detect the presence of blood. Moreover, she had personal knowledge of and provided details about the safety measures in place at the lab. *See id.* at 518. This protocol requires having a second reader verify a positive blood result, which she confirmed occurred in appellant's case. Castillo also identified the evidence screener and second reader and confirmed that they both still worked at the lab.

Finally, as observed in *Paredes*, which also involved DNA extracted from a bloodstain on an item of clothing, the Supreme Court "explicitly refused to hold in *Melendez–Diaz* that 'anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.'" *Paredes*, 462 S.W.3d at 518 (quoting *Melendez–Diaz*, 557 U.S. at 311 n.1, 129 S.Ct. 2527); *see also Mayer v. State*, 494 S.W.3d 844, 852 (Tex. App.–[14th Dist.] 2016, pet. ref'd) (in context of hold-

ing that defendant's Confrontation Clause rights were satisfied despite fact that analyst formerly with the lab who allegedly had been found to be tampering with lab samples may have had access to the DNA samples at issue, citing *Melendez–Diaz*, 557 U.S. at 311 n.1, 129 S.Ct. 2527, and "declin[ing] to adopt a view that the Supreme Court explicitly rejected"). As in *Paredes*, appellant had the opportunity to cross-examine Castillo about her conclusions linking appellant to the crime based on his DNA and about how Castillo arrived at those conclusions. *See* 462 S.W.3d at 514, 519.

Therefore, we conclude that the admission of Castillo's testimony did not violate appellant's rights under the Confrontation Clause. We overrule appellant's first issue.

### B. Due process and the State's use of social media

▇ In appellant's second issue, he argues that the State's use of social media in his case resulted in a denial of his due process rights and that he is entitled to a new trial. Appellant contends that the State's posting and "tweeting" on social media about his trial violated rules 3.06(a)(2), 3.07(a), and 3.09(e) of the Rules of Disciplinary Conduct. *See* Tex. Disciplinary R. Prof'l Conduct 3.06(a)(2) ("A lawyer shall not seek to influence a venireman or juror concerning the merits of a pending matter by means prohibited by law or applicable rules of practice or procedure."), 3.07(a) ("In the course of representing a client, a lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding. A lawyer shall not counsel or assist another person to make such a statement."), 3.09(e) (prosecutor should "exercise reasonable care to prevent persons employed or controlled by the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.07").

Appellant also contends that the State's actions constituted an attempt to violate article 36.22 of the Texas Code of Criminal Procedure, entitled "Conversing with jury." *See* Tex. Code Crim. Proc. art. 36.22 (West 2015) ("No person shall be permitted to converse with a juror about the case on trial except in the presence and by permission of the court."). Appellant acknowledges that the State was "unsuccessful" in communicating to this jury in this case but nevertheless contends that "as a policy matter" this court should reverse to put an end to the State's practice of posting about pending cases on social media.

The State's posting on social media about pending cases might present serious ethical and procedural concerns and might even compromise a defendant's due-process rights. However, our task is narrow: we are charged with reviewing whether the trial court abused its discretion in refusing to grant appellant a new trial in this case. *See Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). We do not substitute our judgment for that of the trial court but instead consider only whether the trial court's decision was arbitrary or unreasonable. *See id.* The trial judge is the fact finder at a hearing on a motion for new trial; we will not second-guess the trial court's judgment concerning the credibility of witnesses. *See id.*

▇ "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Benefield v. State*, 389 S.W.3d 564, 571 (Tex. App.–Houston [14th Dist.] 2012, pet. ref'd) (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).

For an accused to receive a fair trial consistent with due process of law, the jury must determine his guilt or innocence solely on the basis of the evidence admitted at trial and not on the basis of facts or allegations appearing in the media. *Narvaiz v. State*, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992).

Here, during voir dire, the trial court instructed the jury:

[W]e want you to get all of the information here in the courtroom and not from any outside source. I don't know if there will be any publicity about this case or not, but I'm going to instruct you not to read any newspapers, not to watch the TV news, don't listen to the radio news. If any of you are sports nuts or weather nuts, somebody can call you when the weather or sports come on; and you can watch that. Otherwise, you have to save the newspapers until another time. So, please don't listen to anything or read anything about the case.

Further, the trial court specifically instructed the jury:

Also, when I say do not communicate about the case, that includes social media. So, just like you cannot talk to anyone about the case, you also can't put anything about it on your blog or your Facebook page. Don't tweet about it. Don't text about it. Don't e-mail about it. That is the same as talking about it. So, we really mean don't communicate at all about the case.

. . .

Should anyone contact you about the case or should you receive information from any source other than in the courtroom, be sure and let the bailiff know right away; and she will bring it to my attention.

In the charge, the trial court instructed the jury:

During your deliberations in this case, you must not consider, discuss, nor re-

late any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

We generally presume that the jury followed the trial court's instructions. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); *Simon v. State*, 374 S.W.3d 550, 552 (Tex. App.–Houston [14th Dist.] 2012, pet. ref'd). The record does not otherwise indicate that the jury did not follow the trial court's admonishments to avoid communications on social media and to base its verdict solely on the evidence.

In addition, during the hearing on the motion for new trial, each of the jurors testified. None of them saw or discussed any social media posts about the trial. All of the jurors stated that the verdict they rendered against appellant was based on the trial evidence. The trial court considered this testimony and was entitled to be the sole judge of the jurors' credibility. *See Lewis*, 911 S.W.2d at 7.

Appellant has not shown that the trial court abused its discretion in denying his motion for new trial. Therefore, we overrule appellant's second issue.

### III. Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.