**Opinion issued July 12, 2022.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00238-CR

———————————

**TRAYMONE EDWARD WHITE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1527803**

---

## MEMORANDUM OPINION

A jury convicted appellant Traymone Edward White of the first degree felony offense of murder and assessed his punishment at fifty years' incarceration. On appeal, Appellant argues (1) the trial court erroneously admitted two out-of-court eyewitness statements made to law enforcement based on the doctrine of forfeiture

by wrongdoing, thereby denying Appellant his Sixth Amendment right to confrontation, or (2) alternatively, the trial court abused its discretion by admitting the out-of-court statements because they constitute inadmissible hearsay.

We affirm.

## Background

On October 19, 2016, following an altercation between Traymone Edward White ("White") and Julius Allen ("Allen"), White shot and killed Allen. The Houston Fire Department EMS ("EMS") and Houston Police Department were dispatched to the scene of the shooting at 10:38 p.m. and 10:40 p.m., respectively. EMS arrived at the scene at 10:42 p.m. and pronounced Allen dead at 10:48 p.m.

White was charged with murder and tried twice before a jury. White did not dispute shooting Allen. Rather, his counsel argued White acted in self-defense and in defense of a third party. The first trial resulted in a mistrial. Six months later, at the conclusion of the second trial, the jury found White guilty of murder, and he was sentenced to fifty years in prison.

### A.    The Altercation and Shooting

On October 19, 2016, at around 10:00 p.m., Allen returned to his apartment complex and parked his Tahoe near three of his acquaintances or neighbors, Derrick Gilbert ("Gilbert"), Trevion Coleman ("Coleman"), and Cornelius Evans

("Evans").[1] Gilbert, Coleman, and Evans were standing with White near the parking lot of the apartment complex. White did not live at the apartment complex but had just arrived and parked his car near the trio in the space next to Allen's truck.[2] Coleman told Gilbert that White and Allen had "got[ten] into it earlier that day" and they were "about to fight."

After parking his Tahoe, Allen left to his apartment. He returned a few minutes later wearing tennis shoes and approached White, asking "What's up?" White responded that he did not want to fight. Allen then hit or punched White in the face and the two men "tussled" briefly and exchanged more words. White then walked to his car, threw his hat inside the trunk, got back in the driver's seat of his car and began to back his car out of the parking spot. Gilbert testified he believed the fight was over at that point.

As White was backing out, Allen began telling White to leave and taunting him. White stopped the car and drove back to the parking spot. Allen began to approach White's car and was standing near the car when Gilbert heard nine or ten

---

[1] The statements in this section are primarily taken from Derrick Gilbert's trial testimony and are generally consistent with statements Trevion Coleman and Cornelius Evans gave to police the night of the shooting.

[2] White is Coleman's cousin and a friend or acquaintance of Gilbert and Evans. White had a passenger sitting in the front seat of his car who was identified at trial as Artie Francis. Francis never got out of White's car.

gunshots.[3] According to Gilbert, he, Coleman, and Evans ran off when they heard the gunshots. After White drove away, the three men returned and checked on Allen, who was lying on his side in the parking lot with gunshot wounds and gasping for air. Coleman ran to Allen's apartment. He awoke Allen's wife and told her White had shot her husband. Allen's wife ran outside and found Allen on the ground next to his truck. Evans told Allen's wife that White had shot Allen. Witnesses called 911, but Allen died before EMS arrived a few minutes later.

Sergeant J. Rexroad with the Houston Police Department ("Sergeant Rexroad") was one of the first responders to arrive at the scene. He testified he was dispatched to the scene of the shooting at 10:40 p.m. and he arrived 11 minutes later. As he was "securing the scene and trying to preserve evidence," Sergeant Rexroad located and spoke to Coleman and Evans. Homicide Detective E. Aguilera ("Detective Aguilera") with the Houston Police Department arrived at the apartment complex about an hour later. He interviewed Coleman, Evans, and Gilbert. White, who had fled the scene, was later arrested, and charged with Allen's murder.

---

[3] When they spoke to police after the shooting, Gilbert, Coleman, and Evans denied seeing Allen with a gun or brandishing a gun at White. White told police Allen and Coleman had been passing a gun back and forth the night Allen was shot. White also claimed Allen shot at him first and then White returned fire. Despite stating he had not seen Allen brandish a gun before he was shot and expressly rejecting the idea that White had been acting in self-defense when he shot Allen, Evans testified at trial that he saw Allen shoot at White. The jury found that White had not acted in self-defense or in defense of a third party when he shot Allen. White is not challenging the sufficiency of the evidence supporting the jury's finding on appeal.

4

**B.    The Article 38.49 Hearing**

White was first tried for murder before a jury in August 2019.  For reasons not apparent from the record, the trial court granted White's motion for mistrial before the State closed its case.  Gilbert testified for the State during the first trial. The State also tried to call Coleman as a witness, but despite repeated efforts to locate and serve him with a subpoena, the State could not locate him.

The State retried White for murder six months later in March 2020.  Two months before White's second trial began, Gilbert was murdered.  The State offered the transcript of Gilbert's sworn testimony from the first trial into evidence.  The trial court admitted the testimony without objection.  Evans also testified.  Coleman, however, was once again unavailable to testify, this time, according to the State, for other reasons.

After the jury was selected for the second trial, the State informed the trial court that Coleman, one of the State's witnesses, had "been threatened if he does testify, maybe in fear of his life [and] he may have been offered compensation to not testify."  The State argued that White had threatened Coleman or offered to compensate him for his testimony.  Based on these allegations and the State's alleged inability to secure Coleman's testimony at trial, the State moved to admit two separate out-of-court statements from Coleman under the doctrine of forfeiture by wrongdoing.  The two out-of-court statements consisted of a (1) a video recording

5

of a 90 second statement Coleman gave to Sergeant Rexroad the night of the shooting (State's Exhibit 7), and (2) an audio recording of a statement Coleman gave to Detective Aguilera at 12:05 a.m. that same night (State's Exhibit 76).

Article 38.49 of the Texas Code of Criminal Procedure codifies what is known as the doctrine of forfeiture by wrongdoing. Under the doctrine, a defendant who procures the unavailability of a witness through wrongful means is barred from asserting a violation of his Sixth Amendment right to confront the witness or complaining about hearsay.[4] *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019). The doctrine generally applies when the defendant has "engaged in conduct designed to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359, 365 (2008) (explaining that absence of forfeiture rule for such conduct "would create an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them").

The trial court conducted an Article 38.49 hearing outside the presence of the jury to determine whether the doctrine applied to Coleman's out-of-court statements

---

[4] The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront a witness against him. *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015). Under the Confrontation Clause, "testimonial" statements—statements that were made under circumstances that would lead an objective witness to reasonably believe they would be available for use at a later trial—are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Id.*

thus rendering them admissible. The State called Allen's wife, Naomi Allen ("Naomi"), as its first witness during the hearing. Naomi testified she knew Coleman had witnessed Allen's shooting because Coleman went to her apartment immediately after the shooting and told her White had shot Allen. According to Coleman, White had been the only person who fired a weapon. Naomi testified that she communicated with Coleman after the shooting over Instagram and he told her he would not testify at White's second trial. The State introduced a printout of Coleman's and Naomi's Instagram messages (State's Exhibit 93). The trial court admitted the exhibit only for the Article 38.49 hearing.

State's Exhibit 93 reflects that Naomi contacted Coleman on Instagram. Naomi told him, "[I]f you love us you will come and tell [these people what] really happened." Naomi also told Coleman that someone was claiming Allen had shot White. Coleman responded, "How [Allen] shot him when they say [Allen] ain't even have no gun." Naomi gave Coleman a phone number which presumably belonged to one of the prosecutors. She asked Coleman to call the prosecutor to tell her what had happened and why he did not want to testify. Coleman replied that he was "torn" because Allen was his best friend and White is his cousin. Coleman then stated:

> [T]his n[****] had n[****] shooting at me they had the whole f[***]ing world screaming I'm a snitch Nd I was gone get killed if I say sum the man even tried to pay me to testify on his behalf I told him no I got a whole baby otw I'm not trying to end up like [Gilbert] cause that wasn't

7

just over no f[***]ing dice game I'm sorry Family I can't do it I didn't even want to do it from the jump IM SORRY Naomi

You tell her for me I fear for my life

White's counsel interjected. He claimed that Gilbert had paid a gambling debt with a counterfeit bill and when the person he paid discovered the bill was counterfeit, the person returned to the apartment complex and shot Gilbert. "Again, my client was in custody this whole time, had nothing to do with it."

The State asked Naomi, "When [Coleman] says, The man even tried to pay me to testify on his behalf, who is the man that he's referring to?" White objected, but the trial judge overruled the objection. The trial court then inquired:

**Trial court**: So, the man tried to pay me not to testify. How do you take —who do you think the man he is referring to would be?

**Naomi**: [White].

**Trial court**: Me, too. All right. I see your point. Kinds of makes sense, doesn't it?

**Naomi:** Yeah.

**Trial court**: It does. All right.

On cross-examination, Naomi testified that Coleman had not wanted to speak to the police to begin with, and to her knowledge he had not been "cooperative with either side of this case." She also testified that she had not seen or heard White threaten Coleman or heard White offer to pay Coleman not to testify. On redirect, Naomi acknowledged that Coleman had spoken to police the night of the shooting,

8

but he was not willing to testify at trial. When asked, "And this is after [White], according to [Coleman], attempted to pay him off?" Naomi answered, "Yes."

White then called his child's mother, Deonjanae Rogers ("Rogers"). Rogers testified she had spoken to Coleman since the shooting, and he had never mentioned that White had threatened him or offered to pay him not to testify. She also confirmed that White and his nephew, Christopher McDade ("McDade"), had been repeatedly in contact with Coleman and she claimed to have listened in on one such conversation when Coleman apologized to White for lying. Unlike Naomi, Rogers did not have a record of the alleged communications to support her testimony.

White's counsel announced that he wanted to call McDade to testify. The trial court agreed the State could continue the hearing to put on its case and he would "keep the statement out until I hear from [McDade.]"

Sergeant Rexroad testified later that day and the State offered Coleman's out-of-court statement to Sergeant Rexroad into evidence. Referring to the Article 38.49 hearing held earlier that morning, White's counsel stated, "And this is Trevion Coleman's statement, which we agreed you would wait until we finished the [hearing] earlier." The trial judge answered, "No, we didn't agree to that about his testimony. Don't go there." The trial court then held Coleman's out-of-court statement was admissible as "an excited utterance video, body worn camera."

9

The trial court later resumed the Article 38.49 hearing and heard testimony from White's nephew McDade and a recorded jail phone call from White. After hearing argument from counsel, the trial court found by a preponderance of the evidence that White had forfeited his right to challenge the admission of Coleman's out-of-court statements under the Confrontation Clause pursuant to Article 38.49 of the Texas Code of Criminal Procedure. Although the trial court did not state whether its ruling applied to Coleman's statement to Sergeant Rexroad or Detective Aguilera, or both, the record suggests that the trial court's Article 38.49 ruling was limited to Coleman's out-of-court statement to Detective Aguilera which occurred at midnight, a little over an hour after the shooting.[5]

In rendering its ruling, the trial court stated in part, "I want to add that the proximity of time suggests that our missing witness, Mr. Coleman, does not have time to be influenced by anybody. And, yes, I understand that [White] has no [sic] Sixth Amendment privilege on this statement; but he forfeited that by wrongdoing. And, again, my impression is there is a lot more than a mere preponderance that brings about this wrongdoing, Mr. Coleman not being here." Detective Aguilera testified the next day and Coleman's out-of-court statement to him was admitted into evidence over White's objections.

---

[5] When the trial court issued its Article 38.49 ruling, the trial court had already ruled to admit Coleman's out-of-court statement to Sergeant Rexroad as an excited utterance.

10

## Discussion

White argues the trial court erred by admitting Coleman's out-of-court statements to Sergeant Rexroad and Detective Aguilera under the doctrine of forfeiture by wrongdoing because he did not threaten or coerce Coleman and the admissibility of Coleman's out-of-court statements violated his Sixth Amendment right of confrontation. In the alternative, White argues that if the trial court did not admit the statements based on the doctrine of forfeiture by wrongdoing, then the trial court abused its discretion by admitting Coleman's out-of-court statements because they constitute inadmissible hearsay.[6]

The State argues that Coleman's statement to Sergeant Rexroad was admissible under the excited utterance exception to hearsay. It argues further that the statement is non-testimonial and therefore, the Sixth Amendment does not bar its admission into evidence. The State also argues that the doctrine of forfeiture by wrongdoing applies to Coleman's statements to both Sergeant Rexroad and Detective Aguilera and that White failed to establish he was harmed by the admission of the statements.[7]

---

[6]   Although White does not address each statement separately in his brief, we do so for purposes of this opinion.

[7]   The State also contends that White waived all of his issues on appeal given, among other things, his failure to address harm.

11

## A. Standard of Review

We review a trial court's decision to admit or exclude evidence based on an abuse of discretion standard. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial judge abuses his discretion when his decision falls outside the zone of reasonable disagreement. *Henley*, 493 S.W.3d at 83; *see also Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (stating trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree"). We cannot reverse a trial court's judgment, however, unless the defendant suffered harm as a result of the trial court's error. *See* TEX. R. APP. P. 44.2 (setting forth separate standards for constitutional and non-constitutional harm).

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is generally not admissible unless it falls within an exception listed under the Texas Rules of Evidence or other rule or statute. *Id.* 802. The admissibility of an out-of-court statement under an applicable exception is within the trial court's discretion. *Kesaria v. State*, 148 S.W.3d 634, 641 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 189 S.W.3d 279 (Tex. Crim. App. 2006). One such exception is the excited utterance exception.

An excited utterance is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." TEX. R. EVID. 803(2). The excited utterance exception stems from an assumption that the declarant is not then capable of the kind of reflection that would enable him to fabricate the information about which he speaks. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). The trustworthiness of the statement is founded on the fact that it is the event that speaks through the declarant and not the declarant relating the event. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

The excited utterance exception applies only when (1) the statement results from a startling occurrence that produces a state of nervous excitement in the declarant and renders the utterance spontaneous, (2) the state of excitement dominates the declarant's mind such that there is no time or opportunity to contrive or misrepresent, and (3) the statement relates to the circumstances of the occurrence preceding it. *See Kesaria*, 148 S.W.3d at 642. "The critical determination regarding the excited utterance exception is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition at the time he or she made the statement." *Villanueva v. State*, 576 S.W.3d 400, 406 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *see also Tyler v. State*, 167 S.W.3d 550, 555 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Although we can consider the time lapse between the event and the statement, as well as whether the statement was

13

made in response to questioning, these factors are not necessarily dispositive. *Villanueva*, 576 S.W.3d at 406. The question before us is "whether the statement was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Id.*

Generally, the erroneous admission of evidence constitutes non-constitutional error, subject to a harm analysis requiring reversal only if the error affected the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).

## B. Coleman's Statement to Sergeant Rexroad

The trial court admitted a videotaped statement Coleman gave to Sergeant Rexroad shortly after the shooting. (State's Exhibit 7). The statement is about 90 seconds long and was recorded by another officer's body worn camera.

Sergeant Rexroad was one of the first HPD officers to arrive at the scene. He testified he was dispatched to the scene at 10:40 p.m. and he arrived at the apartment complex nine minutes later at 10:49 p.m. When he arrived at the scene, Sergeant Rexroad did not know who had been involved in the shooting. He also did not have a description of the shooter or know the shooter's whereabouts. Sergeant Rexroad testified that his initial concern was "get[ting] a suspect description as quickly as I could, primarily to let us know what we're looking for, what they looked like, names, if they are in a vehicle" to "put that information out to the dispatcher and to other

14

officers" to assist apprehension and protect unsuspecting officers. Sergeant Rexroad testified he "[a]bsolutely" treated the scene as an "ongoing emergency when [he] first arrived[.]"

Sergeant Rexroad testified he located and spoke to two eyewitnesses: Coleman and Evans. When asked to describe Coleman's demeanor, Sergeant Rexroad testified:

> [H]e was pretty emotional. He was sweating. He couldn't stand still. He was swaying back and forth a lot, rocking back and forth. His breathing was a little labored. And he had some issues with providing me answers to basic, you know, questions like his birthdate. He was struggling to get the words out and almost, you know, on the verge of becoming very emotional.

When asked if Coleman "was still very much under the excitement of witnessing the shooting," Sergeant Rexroad agreed that he was. Sergeant Rexroad then sponsored his 90 second recorded conversation with Coleman, which was captured on another officer's body worn camera. The State offered the recorded statement into evidence, at which time White objected to its admission based on lack of authentication. Referring to the Article 38.49 hearing held earlier that morning, White's counsel stated, "And this is Trevion Coleman's statement, which we agreed you would wait until we finished the [hearing] earlier." The trial judge answered, "No, we didn't agree to that about his testimony. Don't go there." The trial court then held Coleman's statement was admissible as "an excited utterance video, body worn camera" and admitted the statement into evidence.

15

The recorded interaction between Sergeant Rexroad and Coleman, which was less than 90 seconds long, was published to the jury. In the video, Coleman tells Sergeant Rexroad that White shot his "brother" Allen "from the car, from inside it." Sergeant Rexroad then asks for Coleman's identifying information, including his name, address, phone number, and birthdate, which Coleman provides. Coleman appears to be sniffling and he is swaying from side to side and his voice begins to break. Sergeant Rexroad tells him to "take a breath, man, [it's] okay." "I know its tough man, but the more info we get from you, the better chance we have of finding the guy." Coleman then identifies the shooting victim as Allen and tells Sergeant Rexroad where Allen lives, but he cannot remember Allen's birthdate. When asked to identify the person "you said shot him," Coleman reiterates that it was White.[8] Sergeant Rexroad testified that Coleman's and Evan's statements were consistent because neither witness suggested there were two shooters, or that a shootout occurred.

We conclude Coleman's statement to Sergeant Rexroad was an excited utterance and thus admissible. That Coleman's statements were made in response to Sergeant Rexroad's questioning does not make the statements inadmissible under the excited utterance exception; it is only a factor for courts to consider. *See*

---

[8] White does not dispute he shot Allen. The issue at trial was whether White shot Allen in self-defense or defense of another.

16

*Villanueva*, 576 S.W.3d at 406. The key question is whether Coleman was still dominated by the emotions, excitement, fear, or pain of the shooting when he gave his statements to Sergeant Rexroad. Sergeant Rexroad's testimony that Coleman was "pretty emotional," "sweating," his "breathing was a little labored," "[h]e couldn't stand still," and was "swaying back and forth a lot, rocking back and forth," are supported by the recorded statement and it supports the trial court's determination that Coleman was still dominated by the emotions of the shooting when he made his statements to Sergeant Rexroad. *See Zuliani*, 97 S.W.3d at 595; *Villanueva*, 576 S.W.3d at 406. The fact Sergeant Rexroad arrived 11 minutes from time of dispatch and located Coleman as he was "securing the scene and trying to preserve evidence" also supports the trial court's finding. *See Apolinar*, 155 S.W.3d at 185 (holding statement made four days after exciting event admissible as excited utterance); *see also Adams v. State*, No. 06-99-00016-CR, 2000 WL 639941, at *1–2 (Tex. App.—Texarkana May 19, 2000, no pet.) (not designated for publication) (holding statements made hour to hour and half after event were admissible under excited utterance exception to hearsay).

Under these circumstances, we conclude the trial court did not abuse its discretion in admitting Coleman's out-of-court statement to Sergeant Rexroad under the excited utterance exception. *See Campos v. State*, 186 S.W.3d 93, 99–100 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding complainant's statements to

17

police officers, made forty-three minutes after robbery, were admissible under excited utterance exception when statements were made in response to questioning and officers testified that complainant was crying, upset, and frightened).[9]

## C. Coleman's Statement to Detective Aguilera

The trial court also admitted an audio recording of the out-of-court statement Coleman gave to Detective Aguilera the night of the shooting. The trial court admitted the statement under the doctrine of forfeiture by wrongdoing based on its finding that White had engaged in conduct that intended to, and did, result in Coleman's unavailability to testify.

To the extent White challenges the admission of Coleman's statement to Detective Aguilera based on the Confrontation Clause or the doctrine of forfeiture by wrongdoing, we need not address whether the trial court erred in admitting Coleman's statement on these grounds. Even were we to conclude the trial court erred by admitting Coleman's statement to Detective Aguilera, White's brief fails to address in any way how he was harmed by its admission, an element he is required to establish on appeal. *See Edwards v. State*, No. 01-20-00064-CR, 2020 WL 6435769 (Tex. App.—Houston [1st Dist.] Nov. 3, 2020, no pet.) (mem. op., not

---

[9] To the extent White argues on appeal the trial court erred in admitting Coleman's statement to Sergeant Rexroad under the doctrine of forfeiture by wrongdoing or the Confrontation Clause, White fails to argue in any way how he was harmed by the admission of this statement, and therefore, for the same reasons discussed in the Subsection C, White waived these issues.

designated for publication) (explaining that to prevail on appeal, appellant had to demonstrate both that trial court abused its discretion in admitting witness' out-of-court statements under doctrine of forfeiture by wrongdoing and that such error was harmful).

To assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not provide supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000); *Chaves v. State*, 630 S.W.3d 541, 555 (Tex. App.—Houston [1st Dist.] 2021, no pet.). An appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017); *see also Chaves*, 630 S.W.3d at 555. A brief that does not apply the law to the facts does not comply with Texas Rule of Appellate Procedure 38.1 and presents nothing for our review. *See Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003); *see also Chaves*, 630 S.W.3d at 555.

In *Chaves v. State*, 630 S.W.3d 541 (Tex. App.—Houston [1st Dist.] 2021, no pet.), this Court held that a defendant waived his challenge to the admission of evidence on appeal because he failed to brief adequately his assertion that he was

19

harmed because of the alleged error. *Id.* at 557–58; *see Cardenas*, 30 S.W.3d at 393 (holding defendant waived issue on appeal because he failed to address whether alleged error was harmless); *Wilson v. State*, 473 S.W.3d 889, 900–01 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) ("Here, we do not address whether the trial court erred in admitting the complained-of . . . evidence because even were we to conclude that the trial court erred in admitting such evidence, appellant, in his brief, does not argue that he was harmed by its admission."). We held that Chaves failed to brief his evidentiary issue adequately because he "provides[ed] only two conclusory sentences, without citation to authority, asserting that he 'suffered harm as a result of the trial court's admission of' State's Exhibits 13 and 14 because 'the recordings were on the jury's mind while they deliberated.'" *Id.* at 558. The Court explained Chaves' brief "contain[ed] no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the State's exhibits" and it was not our role to make his arguments for him. *Id.*

We reached the same result in *Edwards v. State*, No. 01-20-00064-CR, 2020 WL 6435769 (Tex. App.—Houston [1st Dist.] Nov. 3, 2020, no pet.) (mem. op., not designated for publication). In *Edwards*, the defendant argued that the trial court committed reversible error by admitting a witness' out-of-court statements under the doctrine of forfeiture by wrongdoing. *Id.* at *2. We explained that "to be entitled to

20

reversal on this issue, Edwards must demonstrate that the trial court abused its discretion in admitting [the witness'] out-of-court statements pursuant to the doctrine of forfeiture by wrongdoing *and* that such error was harmful." *Id.* We held Edwards failed to brief this issue adequately because he only made a cursory statement that the admission of the evidence was "unfairly prejudicial," and he did not "cite to the record, make any argument, or provide any supporting legal authority to explain how or why the admission of" this evidence resulted in harm. *Id.* at *3.

White likewise waived any complaint as to the admission of Coleman's statement to Detective Aguilera. White argues in his brief that "[t]he State used Coleman's testimony to disprove [White's] self-defense theory" and that the admission of "any 38.49 evidence . . . deprived [White] of a fair trial." White then concludes, without more, that the admission of Coleman's out-of-court statements had an "impact on Appellant's substantial rights." This is the entirety of White's argument that the admission of Coleman's statements was harmful.

Like in *Edwards* and *Chaves*, White does not cite to the record, identify the applicable standard for assessing harm, make a substantive argument, or provide any supporting legal authority to explain how or why the admission of Coleman's statements resulted in harm. He likewise does not identify which of the two Coleman statements he specifically complains about or what portions of the statements had an "impact on [White's] substantial rights." At most, White provides conclusory,

21

cursory allegations of harm which are insufficient to meet the requirements of Rule 38.1.

Because White failed to brief the issue adequately by identifying the harm he suffered due to the trial court's admission of Coleman's statement to Detective Aguilera, we hold White waived this issue.[10] *See Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Wilson*, 473 S.W.3d at 901 (holding defendant waived evidentiary challenge because he did not "identify[] the harm that he suffered as a result of the admission of the complained-of evidence"); *Chaves*, 630 S.W.3d at 555; *see also Edwards*, 2020 WL 6435769 at *2–3.

We overrule White's challenge to the admission of Coleman's out-of-court statements.

---

[10] The same is true with respect to the admission of Coleman's statement to Sergeant Rexroad. White does not make any harm analysis as to that statement. Thus, to the extent White claims the trial court erred in admitting the statement (under the doctrine of forfeiture by wrongdoing, or in violation of the Confrontation Clause), White waived those issues.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).