

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00295-CR

_____

KEVIN WAYNE SIMEON, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from County Criminal Court No. 8
Tarrant County, Texas
Trial Court No. 1687683

_____

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

When Hurst Police Corporal Nathan Pugh spoke with Appellant Kevin Wayne Simeon after pulling him over for speeding, he noticed Simeon's "slurred speech[ and] red, watery, bloodshot eyes" and "a slight odor of an alcoholic beverage with a lot of cologne on top." After Simeon's performance on the horizontal gaze nystagmus (HGN) test revealed four clues, Corporal Pugh called Officer Cody Jaynes, a dedicated driving-while-intoxicated (DWI) officer, to continue the investigation. Officer Jaynes arrested Simeon after he failed two more standardized field sobriety tests (SFSTs).[1] Corporal Pugh searched Simeon's vehicle and found in the center console an open container of a liquid, which he testified smelled like an alcoholic beverage. At the police station, Simeon consented to a blood draw. Over Simeon's Confrontation Clause objections, a forensic analyst who had not performed the test on Simeon's blood sample testified that his blood–alcohol content (BAC) was .108.

Simeon testified that he drank two beers at a friend's barbecue and thought he had been driving fifty-five miles per hour (m.p.h.) in a forty-five-m.p.h. zone on his way home that night. He explained that he had been tired that night and had no explanation for his high BAC or why he had been unable to walk a straight line during the SFSTs. He identified the container as his water cup.

---

[1]The jury viewed both officers' body camera footage and the dashboard camera footage of Simeon's driving.

The jury was charged that "intoxicated" means "[n]ot having the normal use of mental or physical faculties by reason of the introduction of alcohol into the body" or "[h]aving an alcohol concentration of 0.08 or more," *see* Tex. Penal Code Ann. § 49.01 (defining "intoxicated"), and deliberated for less than forty minutes before unanimously finding Simeon guilty.

The trial court found the indictment's open-container enhancement paragraph true, sentenced Simeon to ninety days' confinement and a $500 fine, suspended the sentence of confinement, and placed Simeon on fifteen months of community supervision. *See id.* § 12.22 (stating that Class B misdemeanor punishment range is confinement in jail for not more than 180 days, up to a $2,000 fine, or both), § 49.04(c) (stating that a DWI offense is a Class B misdemeanor if, at the time of the offense, the driver had an open container of alcohol in his immediate possession).

In a single point, Simeon complains that the trial court violated his Sixth Amendment right to confrontation when it admitted the BAC test results despite the failure of the forensic scientist who performed the analysis to testify. *See* U.S. Const. amend. VI. Simeon is correct that the trial court erred by admitting those results without that analyst's testimony. *See generally Bullcoming v. New Mexico*, 564 U.S. 647, 652, 131 S. Ct. 2705, 2710 (2011) ("The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist."); *Paredes v. State*, 462 S.W.3d 510, 517 (Tex. Crim. App. 2015) ("The admission of a lab

report created solely by a non-testifying analyst, without calling that analyst to sponsor it, violates the Confrontation Clause."); *Burch v. State*, 401 S.W.3d 634, 637–38 (Tex. Crim. App. 2013) (holding that the Confrontation Clause was violated by the admission of a drug analysis when only the reviewing analyst, and not the testing analyst, testified).

However, because the error was ultimately harmless, *see* Tex. R. App. P. 44.2(a), we overrule Simeon's sole point and affirm the trial court's judgment.

## II. Harmless Error

Simeon argues that the blood test results were the only objective evidence the State had to connect him to intoxication over the .08 per se level. He contends that "[w]ithout the erroneously-admitted breath [sic] test results, [he] would not have been exposed to a conviction on the per se theory of intoxication" and argues that it cannot be shown that the trial court's error was harmless beyond a reasonable doubt. Based on our analysis below, we disagree.

## A. Standard of review

When an error is constitutional, Rule of Appellate Procedure 44.2(a) requires us to reverse the conviction unless we determine beyond a reasonable doubt that the trial court's error did not contribute to the conviction. *See id.*; *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020). That is, "[i]f there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless

4

beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

Our harmless-error analysis should not focus on the propriety of the trial's outcome but rather should focus on whether the constitutional error adversely affected the integrity of the process leading to the conviction. *See Wells*, 611 S.W.3d at 410; *see also Wesbrook*, 29 S.W.3d at 119 ("[T]he appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence."). To that end, we "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt the error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Wells*, 611 S.W.3d at 410. Other factors to consider may include, if applicable, the nature of the error, the extent that the State emphasized it, its probable collateral implications, and how a juror would likely have weighed it "in the course of [jury] deliberations." *Id.* at 410. We evaluate the entire record in a neutral manner and not in the light most favorable to the prosecution. *Id.* at 410–11.

Further, when reviewing a Confrontation Clause violation's harm, we consider how important the out-of-court statement was to the State's case; whether it was

cumulative of other evidence; the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *see also Langham v. State*, 305 S.W.3d 568, 582–83 (Tex. Crim. App. 2010) (quoting *Scott* factors and reversing and remanding the intermediate court's "truncated harm analysis" for a redo). We must ask whether there is a reasonable possibility that the error moved the jury from a state of non-persuasion to one of persuasion on the intoxication issue. *See Langham*, 305 S.W.3d at 582.

## B. Preservation

The State concedes that the trial court's admission of the blood test results was error[2] but argues that it was rendered harmless by other, unobjected-to testimony—set out below—containing the same material facts as the report.

Outside the jury's presence, Simeon's counsel objected to the testimony of Keith Temporal, the forensic analyst, based on the Confrontation Clause after he said "yes" when asked "I think what you're saying is you looked at the result and said, okay, I'm going to say grace over it. Would that be fair to say?" After the prosecutor asked Temporal another series of questions about his review of the file and reaching his own opinion, which was that he had "no reason to believe that there was anything

---

[2]We are not bound by the State's concession on an issue of law. *Oliva v. State*, 548 S.W.3d 518, 520 (Tex. Crim. App. 2018).

6

inaccurate or improper in the [absent analyst's] analysis," Simeon's counsel renewed

his objection, stating,

> I can't think of any testimony that hits our right to confrontation any squarer on the head, which is this fellow says it must have been right because there's a number printed on a piece of paper. Are there procedures? Yes. Did she follow the procedures? I don't know. He's essentially saying you would have to ask her. Well, we can't ask her and there, you know -- so renew our objection.

The trial court overruled the objection.

The State refers us to the following testimony by Temporal that occurred after

the trial court admitted the report into evidence:

> Q. Now, you didn't review -- you didn't produce this score, correct, this exact one, right? You did your own analysis, correct?
>
> A. *I did my own review of the data. I didn't perform the specific analysis on the blood tube but I performed a review of someone else who had performed the analysis.* [Emphasis added.]
>
> Q. How does that work? What is the process when reviewing someone else's work?
>
> A. So all the information and documentation that is associated with this case is uploaded to our lab's information management system or LIMS, and that's all put into a case file. And so I review all of the documentation that was associated with this case file and reviewed it for accuracy, reviewed that it was properly documented, and made an assessment based on my review of the data to come up with my own score.
>
> Q. And did you come up with your own score?
>
> A. Yes, it was .108.
>
> Q. The same?

A. Yes.

Q. As what we see on the screen?

A. Yes, it was.

Q. If something happened in the analysis of the blood, would there be documentation of it?

A. If there was anything that indicated that it was improperly --

Q. Like an error.

A. If there was an error, that would be recorded in any notation by the analyst.

Q. Was there an error notated?

A. I did not see any errors notated.

Q. So is it safe to say, to the best of your knowledge, that the blood analysis was done correctly?

A. Yes, to my knowledge.

The State contends that through this testimony, Temporal established an independent analysis of the data showing a BAC of .108, and that this testimony was unobjected-to.

The State's argument that failure to object to this evidence rendered the error harmless disregards an exception to the general contemporaneous-objection requirement. *See Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003). In *Geuder*, the Court of Criminal Appeals explained that under Rule of Evidence 103, when a trial court hears objections to offered evidence outside the jury's presence and rules

8

that such evidence be admitted, "such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections." *Id.*; *see* Tex. R. Evid. 103(b). We conclude that Simeon sufficiently preserved his objection to this testimony that the State argues rendered the error harmless. *See* Tex. R. Evid. 103(b); *Geuder*, 115 S.W.3d at 13; *see also* Tex. R. App. P. 33.1. Accordingly, we review the rest of the record to determine whether the error was harmless beyond a reasonable doubt. *See* Tex. R. App. P. 44.2(a).

## C. The record

### 1. Opening statements

The jury's voir dire was not included in this record. However, the prosecutor referenced it in his opening statement, stating, "I want you guys to think about what you guys said yesterday when my court partner asked do you guys agree that it's important to prosecute DWIs." He referenced their answers—public safety and accountability for risking others' lives—and stated that he anticipated that "based on the testimony of our officers and analyst," the jury would agree that Simeon had been intoxicated while driving. He also stated that he anticipated that based on the body camera footage the jury would "agree as well that [Simeon] was intoxicated."

Simeon's counsel opened by telling the jury that they would have doubts about whether Simeon was speeding, that the officers were motivated to find a DWI, and that the SFSTs were unfair because the HGN lacked scientific validity and the leg-oriented tests were invalid because Simeon was overweight. He directed them to

9

consider Simeon's physical appearance on the body camera footage and pointed out that they would not hear any testimony from the person who conducted the blood analysis "to see if they did it right."

## 2. Officer testimony

Corporal Pugh, a SFST instructor, testified that he was on patrol on the evening of May 14, 2021, in his uniform and in a marked patrol unit, when he stopped Simeon for driving "68 in a posted 45." State's Exhibit 8, the patrol unit's dashboard camera footage, showed Simeon's white Chevrolet Silverado stopped at a red light; it then rolled forward in anticipation while the light remained red. When the light turned green, the Silverado accelerated into the intersection faster than surrounding vehicles, arriving first at the next red light. When that light turned green, Corporal Pugh activated his emergency lights. Simeon activated his truck's blinker and pulled over to the shoulder when it was safe to do so.

Corporal Pugh testified that when he spoke with Simeon through the driver's side window of the Silverado, he noticed that Simeon "had slurred speech [and] red, watery, bloodshot eyes" and that he smelled "a slight odor of an alcoholic beverage with a lot of cologne on top of that." Corporal Pugh asked Simeon where he was coming from, where he was going, and whether he had been drinking that night. Simeon told him that he had two Bud Lights at a barbecue in Fort Worth and was going home.

Corporal Pugh asked Simeon to step out of the truck and to join him at the back of the truck, where he performed the HGN test. The HGN test checks for involuntary jerking of the eyes as they gaze side to side; "[i]t can show impairment caused by alcohol or several different drug categories." Corporal Pugh did not ask Simeon if he had any visual impairments, and Simeon denied that he had any physical handicaps or disabilities. The jury viewed Corporal Pugh's body camera footage, which shows Simeon's difficulty with following the instruction not to move his head during the test. Corporal Pugh saw four clues using the HGN, stopped the test "after distinct and sustained nystagmus at maximum deviation," and then contacted Officer Jaynes. Officer Jaynes took over conducting the SFSTs when he arrived.

Officer Jaynes testified that he could smell alcohol on Simeon's breath and person, and he also noticed Simeon's slurred speech and red, watery eyes. Simeon told Officer Jaynes that he had "a couple of beers" at the barbecue, that he had been "working a lot of hours lately," and that he was "just tired." When Officer Jaynes asked him if he felt like he was intoxicated, Simeon delayed a moment before stating that he did not and that he felt like he could make it home. When Officer Jaynes then asked him if he felt "buzzed," Simeon stated, "Maybe." Officer Jaynes then administered the HGN test, the walk-and-turn test, and the one-leg-stand test.[3] The jury viewed Officer Jaynes's body camera footage.

_____

[3]During cross-examination, both Corporal Pugh and Officer Jaynes agreed with Simeon's counsel that the National Highway Traffic Safety Administration (NHTSA)

Officer Jaynes explained that SFSTs are overseen by the NHTSA and taught across the country. The HGN test is a clinical indicator of impairment while the walk-and-turn and one-leg-stand tests are divided attention (psychophysical) tests. He stated that the HGN test had a total of six possible clues, with four as the threshold to arrest, and that he saw all six during Simeon's test. The walk-and-turn test had eight clues divided into two parts—the instructional stage and the walking stage—and it showed loss of mental and physical faculties. Officer Jaynes stated that he observed six clues during that test. The one-leg-stand test had four clues—again showing loss of mental and physical faculties, with two clues as the arrest threshold—and he saw three clues during Simeon's test. Officer Jaynes arrested Simeon for DWI at the tests' conclusion. He transported Simeon to jail and then gave him his statutory warnings before Simeon signed the consent to supply a blood specimen.

After Officer Jaynes arrested Simeon, Corporal Pugh searched Simeon's truck, found an open container of liquid in the truck's center console, and—pursuant to procedure—dumped the contents "so nobody c[ould] claim we drank it or anything like that." Corporal Pugh described the cup as an "open container of alcohol in a TCU Yeti styled cup." He stated that he was familiar with the smell of alcohol and

_____

improved field sobriety detection manual stated that people over age 65 or people overweight by more than 50 pounds might have difficulty with the leg exercises regardless of alcohol consumption. Simeon was sixty years old at the time of the blood draw, and Officer Jaynes had to use two sets of handcuffs on Simeon—the left cuff connected to the right cuff on the second set, as an extender—when he arrested him.

that when he opened the cup and smelled the contents, the contents smelled like an alcoholic beverage.

During cross-examination, Corporal Pugh agreed that when the police find white powder inside a vehicle's console, they do a preliminary field test to determine what the substance is instead of throwing it away. He also agreed that, although contrary to department policy, he could have brought in a sample of the cup's contents for testing. On redirect, he agreed that he was familiar with the smell of alcohol and that it would be a safety issue to smell an unknown white powder.

Both Corporal Pugh and Officer Jaynes testified that they had concluded that Simeon was intoxicated. Officer Jaynes testified that he reached that conclusion based on his training, experience, and observation of Simeon. During cross-examination, however, Officer Jaynes acknowledged that the ability to recall specific biographical details, such as name, address, social security number, workplace, workplace address, and date and place of birth—all information that he had obtained from Simeon—showed the presence of mental faculties. On redirect, he said, "No," when asked whether someone had to have a loss of all his normal mental or physical faculties to be intoxicated.

Corporal Pugh stated that he had conducted "somewhere close to a thousand" DWI investigations and that he had concluded that Simeon was intoxicated based on his experience and training and the totality of what he had observed to that point— the slurred speech, the alcoholic-beverage odor, the HGN clues, and the open

13

container. On cross-examination, Corporal Pugh agreed that nothing in the way Simeon had driven showed that he could not maintain a single lane of traffic and that he had obeyed all traffic signals, had promptly responded to Corporal Pugh's emergency lights, and had pulled over onto the shoulder, which was a safe place. He agreed that he had never spoken with Simeon before the stop and did not know what Simeon's normal speech was like. He also agreed that the body camera's angle did not show Simeon's eyes and that he did not conduct the other SFSTs or watch Simeon perform them.

### 3. Blood testimony[4]

Cathryn Marrufo, the nurse who performed Simeon's blood draw, testified that she had performed around 5,000 blood draws in her eight years as a nurse. However, she had performed significantly fewer DWI blood draws because they were on an as-needed basis. The difference between a regular blood draw and a DWI blood draw is that the police supply the DWI blood-draw kit, including the antiseptic swab[5] for cleansing the draw site. She did not recall whether the kit she used to take Simeon's blood used a swab containing alcohol but agreed that most blood-draw kit swabs contain alcohol.

---

[4]We do not include any voir dire testimony taken outside the jury's presence.

[5]The parties referred to the kit's antiseptic cloth alternatively as a swab, a wipe, and a towelette. For consistency, we refer to it as a swab.

Although the prosecutor showed to Marrufo a blood-draw kit, which she confirmed "look[ed] exactly like what was provided to [her]," the kit was neither offered nor admitted into evidence. When asked, "In looking at the type of [swab] that's provided in here, is this a type of [swab] that would contain alcohol or no alcohol in it, if you know?" Murrufo replied, "I'm not a chemist, but I don't believe it would have alcohol."

Maruffo and Officer Jaynes both signed a blood-withdrawal-procedure form indicating that she had used Betadine or another non-isopropanol (i.e., non-alcohol) solution to disinfect Simeon's arm. The form was admitted for record purposes only, and Marrufo testified that she did not know what swab had been used but that it had not been Betadine.

On cross-examination, Maruffo stated that Officer Jaynes had instructed her not to throw anything away, and she confirmed that she had not thrown away the swab. Simeon's counsel noted, "The package for the swab talks about the chemicals [in the swab] but the swab is not in the package[,] and I don't know what happened to it . . . . If you threw it away, just say [you] threw it away." Maruffo replied, "I don't recall," but again confirmed that her instructions had been not to throw anything away.

Keith Temporal, a forensic chemistry training specialist at NMS Labs, testified that he had been cross-trained in BAC analysis, meaning that he could "analyze blood samples for the concentration of alcohol." Temporal had a bachelor's degree in

chemistry and a master's degree in forensic science, and he had worked for NMS Labs for seven years. He had testified eight or nine times as an expert witness, mostly as to BAC but also as a drug chemist.

Temporal explained the process of BAC testing. A client, usually a police agency, would submit a blood kit typically containing two tubes of the suspect's blood and then NMS would give it a case number and store it in a secure refrigerated location until a BAC analyst ran it through the gas chromatography instrument to calculate the amount of alcohol in the sample and report findings.

Temporal testified that he had reviewed other analysts' reports, stating,

> So if a previous analyst has issued a report based on their findings, all of that data and documentation used to come to their conclusion has been saved in . . . our laboratory information management system [(LIMS)]. We call this a case file. And whenever I review data, I will look at that case file and ensure that NMS case number that's listed . . . matches with what's been requested in terms of the report, and I will come to my own conclusion based on the data that I review.

Temporal identified State's Exhibit 7 as the NMS report and said that he had reviewed it but that it had been generated by a different analyst, Nicole Almeter.[6] Temporal stated that he had reviewed the raw data associated with the case and opined—after the trial court overruled Simeon's objection—"that the analysis was

---

[6]At this point, when the State offered State's Exhibit 7—the report—Simeon's counsel requested a hearing outside the jury's presence.

16

accurate, that the run was passing and, therefore, the results were accurate and reliable."[7]

The next morning, after another hearing outside the jury's presence, the trial court admitted State's Exhibit 7 for all purposes. State's Exhibit 7 shows that there were two vials of blood, that Almeter tested one of them, that the ethanol content of the tested vial was "108 (+/-7) mg/dL," and that the BAC was "0.108 (+/-0.007) g/100 mL." Following the test results' admission, Temporal testified as follows in response to the prosecutor's questions:

> Q. Let's skip down to right here where it says results and conclusion. Can you explain to me what this area is?
>
> A. Yes. So we have two blood tubes that were submitted[,] and this section is the result section for the blood tubes that were tested. So Exhibit 1 was the first blood tube and it was tested[,] and it gave us the result of 108 milligrams of alcohol per deciliter, but we also reported .108 grams per hundred milliliters blood.
>
> Q. I noticed there's a plus or minus 7 and a plus or minus 0.007. What is that?
>
> A. That value is our measure of uncertainty. That's just the expected variation that we would have in any measurement that we take for analysis and we report it just to show that the true value of the sample -- the true value of the result could lie in this range.
>
> Q. So when you say within the range, what do you mean, higher or lower?

---

[7]Outside the jury's presence, the trial court explained, "So part of the reason the Court sustained the previous objection is that there had been no testimony he obtained an independent analysis and formed his own opinion. That hurdle has now been crossed and he has stated that."

A. It could be both higher and lower than the 108 value. So the true value could lie anywhere between 101 and 115.

Q. And is this number higher than .08?

A. Yes, it is.

Q. And the lowest number that it could possibly be, is that higher than a .08?

A. Yes, because that would be 0.101.

Q. And the higher number it could possibly be, is that above a .08?

A. Yes, it is.

We have already set out the remaining portion of this testimony in our preservation analysis above.

During cross-examination, Simeon's counsel brought out that Almeter had performed the test, that she had left the country in November 2021, that the lab would have retested the blood if the State had requested it, and that Almeter did not make an audio or visual recording of the steps she took to test the blood. He also asked about the missing swab from the blood-test kit. Temporal said that his lab did not test the swab to make sure it had no alcohol and that "[w]e just leave the [swab] in the blood kit."

Simeon's counsel then asked him, "This blood kit has no [swab] in it. It has a wrapper for a [swab]. And we have already determined that the nurse did not throw the swab away. Are you saying that -- you're not saying that your company threw it

away, are you?" Temporal replied, "No, we don't throw anything away that we receive in terms of evidence." Simeon's counsel made the point that Temporal did not know how the swab got thrown away despite the lab's procedure not to do so, emphasizing,

> Q. . . . And if your lab doesn't throw away the swab that goes on the person's arm and the nurse didn't throw it away, how did it get thrown away and why was it thrown away? You don't know. I know you don't know. You don't know how it got thrown away[,] but you know your lab's procedure is not to throw it away?
>
> A. That's correct.

During cross-examination, Temporal identified three possible relationships between alcohol concentration at the time of test and alcohol concentration at the time of vehicle operation—the same, higher, and lower—and the trial court admitted Defense Exhibit 1, a graphic illustrating those possible relationships, over the State's objection. He testified as follows regarding alcohol absorption:

> Q. And let me ask you this as a practical question. If a person is stopped and they had just had a drink of alcohol, an hour later that alcohol may be active in their system but not at the time they were driving because they were stopped right after they had a drink. Would you agree with that?
>
> A. Yes.
>
> Q. It takes a while for alcohol to absorb into the system?
>
> A. Yes.

On redirect, Temporal testified that the lab never made an audio or video recording of testing. He also restated, as follows,

Q. . . . You performed your own analysis of results, correct?

A. I performed my own review of the analysis, yes.

Q. Correct. And your review shows that the blood score was above .08; is that right?

A. That's correct.

Temporal then testified about retrograde extrapolation, explaining that it is a "calculation that can give a theoretical score or theoretical concentration of alcohol in the blood based on the facts in a case." To perform retrograde extrapolation, he stated that he would need to know "the score of the blood draw, the time that sample was collected, the gender of the [d]efendant, the weight of the subject, date and time of the incident and date and time of the last drink if known." He stated that it was not required to know whether the subject had eaten. Over Simeon's running objection, Temporal testified that he had been provided with all the information needed to perform retrograde extrapolation and that he had formed an opinion that at the high end, Simeon's BAC could have been .12 and at the lowest, it could have been .09.

On recross-examination, Temporal agreed that he was not told facts about food consumption, and he agreed that the BAC could be under .08 if Simeon had part of a drink unabsorbed in his intestinal track. When asked how many other chemists' analyses he had reviewed like Almeter's, he replied, "Just one for BAC analysis."

### 4. Simeon's testimony

Simeon stated that he had thought he was driving around fifty-five m.p.h. that night as he headed home from his friend's barbecue, where he had a sandwich and two beers, and that he had driven eight to ten miles before Corporal Pugh stopped him. He had obeyed the traffic lights and stop signs, had safely operated his vehicle, and had pulled over as soon as Corporal Pugh activated his lights. As he had met neither Corporal Pugh nor Officer Jaynes before that evening, Simeon agreed that there was no reason for either to know his regular speech pattern, and he stated, "I always talk slow." That night, he had weighed over 250 pounds.

On cross-examination, the prosecutor noted that Simeon had walked a straight line to the stand and asked him why he could not walk a straight line during the SFSTs. Simeon replied that he had been working a lot of overtime before his arrest and was tired that night. He denied having consumed more than two beers or having had an open container of alcohol in his vehicle that night and could not explain his high BAC. He explained that when he agreed with Officer Jaynes that he had been buzzed, it was because he was tired. He stated that he had not realized that he had been driving sixty-eight m.p.h. that night and agreed that driving that speed in a forty-five-m.p.h. zone was not safe. On rewatching some of State's Exhibit 1, he identified the Yeti-style cup as his water cup.

## 5. Jury charge

The jury charge included the statutory definition of "intoxicated": "[n]ot having the normal use of mental or physical faculties by reason of the introduction of alcohol into the body" or "[h]aving an alcohol concentration of 0.08 or more." The trial court denied Simeon's request for an Article 38.23 instruction on reasonable suspicion for the stop because Simeon had "admitted to speeding on the witness stand."

## 6. Closing arguments

The prosecutor contended that the State had proven intoxication beyond a reasonable doubt "by three different people"—Corporal Pugh, Officer Jaynes, and Temporal—and "actually got [Simeon] to admit he was buzzed," referencing Officer Jaynes's body camera footage. The prosecutor reminded the jury that the State could prove intoxication three different ways—(1) the loss of mental faculties; (2) the loss of physical faculties; or (3) a BAC above .08—and that Corporal Pugh and Officer Jaynes had testified to Simeon's loss of mental and physical faculties, as shown on the body camera footage, while Temporal had stated that Simeon's BAC was above .08.

Simeon's counsel then argued that Temporal had based his testimony on assumptions and attacked that testimony, stating,

> I don't know if any of you have ever had a child go to the hospital and have lab results, but I don't want a doctor walking in and saying, ["]We assume this or we assume that.["] I want that doctor to say, ["]Based on scientific facts, we know this and we know that.["]

22

He also pointed out that Temporal had been unable to tell the jury what Simeon's BAC had been at the time of driving, pointing out that "[i]t's not against the law to have a higher BAC when you're not driving. It's against the law to have it at the time of operating a motor vehicle." He also attacked the officers' failure to take a sample from the open container and field test it for alcohol and the failure to preserve the sterile swab used before the blood draw.

Simeon's counsel repeatedly hammered the blood-test issues, reminding the jury that the nurse said that she did not throw the swab away and that Temporal likewise said that the lab had not disposed of it, and pointing out that it was nonetheless missing. Simeon's counsel stated,

> It's not here. It wasn't preserved. Okay? Why? Well, I would like to ask somebody about it. I would like to ask Nicole Almeter [the missing analyst] about it. I would like to ask her about this test she ran. I would like to ask her if she measured the vials right. I would like to ask her what controls she did. I would like to ask her a lot of questions because you would like to know the answer.
>
> Well, we don't have her[,] and the machine didn't register an error. Okay. Well, you know what? If you put the wrong sample in twice the machine will not register an error. You'll get an artificially high [result]. How do you know? Well, we go back and look at your procedure. Okay. Let's go back and look at your procedure. Tell me about the vials you used. Tell me about the pipettes you used. No, you don't get to do that, Defense, because we removed our expert and brought you a guy who said -- literally said, ["]Well, I'm just here to say grace over it. I don't know if it's done right or not.["] That's what he said. Okay?
>
> And -- okay. So then he gives you a set of calculations and says, Oh, well, based on one of three different things, it could be three different scores. Now, the State of course said, ["]Tell us how it comes out at over .08.["] They didn't say, ["]Tell us how it comes out under

.08,["] which he did after we dragged it out of him.  Well, the question is, is that beyond a reasonable doubt?  Is unknown beyond a reasonable doubt?

He reminded the jury that the State could have answered the questions about the blood test, pointing out that the State could have done so

> by bringing the witnesses who know the truth like maybe -- maybe the -- maybe the chemist who did it or maybe somebody at the lab who threw it away.  Not going to admit that, but somebody threw it away.  There's no question somebody threw it away.  Why was it thrown away?  Obvious -- the obvious reason it was thrown away.  Let's not -- let's not let somebody cross-examine about it.  We'll just throw it away.  Okay?  Kind of like what they did with the alleged alcohol.  Throw it away.  Okay?  And I guess it's a good metaphor because it's kind of what they want you to do with [Simeon], just throw him away.

He also argued that the body camera footage did not show that Simeon had slurred speech and that intoxicated people cannot keep details straight, contrasting Simeon's providing all the detailed information to the officers.  He concluded by arguing, "They certainly haven't shown loss of mental faculties, certainly haven't shown loss of physical faculties, and they certainly haven't shown you .08 at the time of operation."

In rebuttal, the prosecutor responded that just because someone is intoxicated does not mean that he or she will lose all their mental or physical faculties but that the jury could see that Simeon had lost some of them due to the alcohol that he had admitted he drank.  Then she added, "Don't let the Defense trick you.  We will admit someone threw away the [swab].  It's unfortunate but it doesn't change the fact that his blood results were still a .08.  You don't get that way from being buzzed."  She

24

also argued that procedure did not allow the police to collect the alcohol and send it for testing but instead required dumping it.

The prosecutor then referenced the blood test results, stating,

> You can bring this back with you[,] and you can look. You can see, you know, we have that plus 007, plus or minus. Take that down, it's still above .08. And, you know, unfortunately, like they said, our analyst who did this test isn't here, but he testified he trains people at his labs. He trains in BAC. He has done many reports before analyzing other people's work making sure everything is done correctly. This isn't his first time doing it and it's not his last time.

At that point, Simeon's counsel objected to point out that Temporal had testified that it was his first time doing it. The trial court replied, "The jury will recall the evidence."

The prosecutor told the jurors that they could ask for the video footage to rewatch and that the jurors would be able to see Simeon's swaying during the HGN test and his inability to perform the one-leg-stand and walk-and-turn tests. Referencing those tests, she stated, "So if you don't trust this blood score, again, there's two other ways to prove it and we've proved it beyond a reasonable doubt."

### 7. Deliberations

After eight minutes of deliberations, the jury requested and received the dashcam video and Corporal Pugh's body camera footage. The jury then deliberated for another twenty-eight minutes.

**D. Analysis**

Although the record reflects that the State relied in part on the BAC test results to prove Simeon's intoxication, it also reflects that the jury likely did not. From the trial's beginning, Simeon's counsel emphasized to the jury that the lab report was unreliable because the person who ran the test was not there to answer questions "to see if they did it right," and he highlighted the missing swab to support his theory that the lab report could not and should not be trusted. *See Bagheri v. State*, 119 S.W.3d 755, 761 (Tex. Crim. App. 2003) (pointing out that a conviction will not necessarily follow from the offer of a BAC test because the factfinder "must still be convinced beyond a reasonable doubt" both that the test "provides trustworthy evidence of alcohol concentration" and that an inference can be made from the test results that the defendant had the relevant BAC at the time of the offense). Additionally, Simeon's testimony allowed the jury to evaluate his sobriety at trial with his appearance on Corporal Pugh's body camera footage and his driving that night on the dashcam footage—both of which the jury requested during deliberations—and to determine whether they believed him or the two officers who investigated him for DWI. During rebuttal, the prosecutor even conceded that if the jurors did not trust the BAC number, they could convict Simeon on the other two bases.

Comparing the BAC evidence to the rest of the record, it was not critical to the State's overall case nor cumulative of the other intoxication evidence, and it was thoroughly discredited by Simeon's counsel through effective cross-examination of

26

the witnesses sponsoring the BAC evidence. Accordingly, we cannot say that there was a reasonable probability that it moved the jury from a state of non-persuasion to one of persuasion as to Simeon's intoxication. *See Langham*, 305 S.W.3d at 582; *see also Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010) ("[A] BAC-test result, by itself, is not sufficient to prove intoxication at the time of driving. There must be other evidence in the record that would support an inference that the defendant was intoxicated at the time of driving as well as at the time of taking the test.").

Further, entirely disregarding the blood-test results (which the jury did not request during its deliberations) and the testimony supporting them by Temporal and Marrufo, the jury could have found beyond a reasonable doubt that Simeon had been intoxicated by not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body based on the officers' testimony, Simeon's testimony about that evening, and Simeon's in-court appearance and demeanor when compared to his appearance and demeanor on the body camera footage, rendering the test-result-admission error harmless. *See* Tex. R. App. P. 44.2(a); *Jordan v. State*, No. 02-12-00301-CR, 2014 WL 2922316, at *6 (Tex. App.—Fort Worth June 26, 2014, no pet.) (mem. op., not designated for publication) (reaching same conclusion on similar facts). We conclude beyond a reasonable doubt that the erroneously admitted blood test results did not contribute to the jury's guilty verdict. *See Scott*, 227 S.W.3d at 694.

27

Because the record reflects that the test-result-admission error was harmless beyond a reasonable doubt, we overrule Simeon's sole point.

## III. Conclusion

Having overruled Simeon's sole point, we affirm the trial court's judgment.

/s/ Dabney Bassel
Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 23, 2024