

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00213-CR

_____

KSONDRA ADELE GOURLEY, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 7
Tarrant County, Texas
Trial Court No. 1823945

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

A jury found Appellant Ksondra Adele Gourley guilty of driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04. The trial court assessed her punishment and sentenced her to sixty-eight days' confinement, with credit for time served. The trial court's judgment included a $100 fine under Texas Code of Criminal Procedure Article 102.0185. *See* Tex. Code Crim. Proc. Ann. art. 102.0185. In two issues on appeal, Gourley argues that (1) the trial court "violated [her] constitutional right to confront the witnesses against her by allowing a surrogate analyst to introduce the blood test results obtained by the testing analyst" and (2) the trial court erred by imposing the $100 fine. Because Gourley did not preserve her confrontation complaint—and because even if she had preserved the complaint, the trial court did not err by admitting the complained-of testimony—we will overrule her first issue. Because the trial court did not orally pronounce the $100 fine, we will sustain Gourley's second issue and modify the judgment to delete the fine. We will affirm the trial court's judgment as modified.

## II. BACKGROUND

On the night of April 6, 2024, Gourley drove a U-Haul truck to Dallas Fort Worth International Airport (DFW Airport). She stopped the U-Haul truck "about 30 feet south of the toll exit." She then told a toll worker that she had been drugged. The toll worker called the police.

2

Lieutenant Joseph Hernandez, a police officer with the DFW Airport Police Department, responded to the call. When Hernandez arrived on the scene, he observed a U-Haul truck "parked prior to exiting the toll plaza" that was "causing a little bit of a traffic issue." Gourley was in the driver's seat of the U-Haul truck. Gourley told Hernandez that she had been drugged. She also said that she smokes methamphetamine; that she had recently smoked methamphetamine; and that she believed that the methamphetamine that she had recently smoked had been "tainted." Hernandez thought that Gourley was intoxicated based on her statements and her anxiety. Accordingly, he turned the investigation over to Officer Lake Sheffer, an officer with the DFW Airport Police Department who had arrived on the scene.

When Sheffer arrived on the scene, he observed that Gourley's pupils were dilated and that she was making "jittery movements"—two indicators of drug use. Gourley admitted to Sheffer that she had been driving. She also admitted that she had been smoking methamphetamine and that she felt "uncomfortable to drive." Gourley stated that she was feeling intoxicated at a level of five on a one-to-ten scale. Gourley told Sheffer that "she believed that what she [had] smoked may have been laced with something else." Sheffer conducted standardized field sobriety tests on Gourley. Gourley had a difficult time following the instructions for the tests and was unable to successfully complete the walk-and-turn and one-leg stand tests.

Sheffer believed that Gourley had lost her mental and physical faculties due to methamphetamine, and he concluded that she was "intoxicated due to the

3

introduction of the methamphetamine and would not be able to safely drive a motor vehicle." Sheffer ultimately arrested Gourley "[b]ased off of the totality of the circumstances," mentioning "[h]er eyes, her jittery movements that were [indicative of] someone who was on drugs, her statements . . . that she had smoked methamphetamine, and her statements that she [had] felt the effects of that while she was operating a motor vehicle on a public roadway," along with her failures to complete the walk-and-turn and one-leg stand tests. Sheffer transported Gourley to HEB Harris Methodist Hospital, where her blood was drawn.[1] The drawn blood was later sent to NMS Labs in Pennsylvania.

Daniel Anderson, a forensic toxicologist employed by NMS Labs, testified at Gourley's trial. Anderson explained to the jury how NMS Labs tested Gourley's blood for drugs. He stated that there is an initial drug screening test that screens for fourteen different categories of drugs. After the screening test, there is a confirmation test "to identify and quantitate the drugs of interest that the original screen told you . . . w[ere] positive." Anderson explained that NMS Labs employs over 200 scientists and works on "a segmented workflow, so everybody has a job to do." He stated that "the totality of the pieces come together," and that is when he "inherit[s] the case."

---

[1] The blood draw occurred approximately one hour and twenty minutes after Sheffer encountered Gourley.

4

Anderson was asked to testify regarding the results of NMS Labs' testing of Gourley's blood. Gourley objected on the ground that a proper predicate had not been laid for offering the results, the trial court sustained her objection, and the jury was removed from the courtroom. Outside of the jury's presence, Anderson explained to the trial court that two other individuals employed by NMS Labs had tested Gourley's blood. Anderson stated, however, that he had conducted his own analysis of the analytical data from that testing and had formed his own conclusions from the data. Anderson stated, "[M]y report is my own conclusions drawn from analytical data, period. It's my own conclusions whether Joe Blow ran it or John Smith ran it."

While the jury was out of the courtroom, Gourley raised additional objections to Anderson's ability to testify regarding the results of NMS Labs' testing—namely, objections based on hearsay, lack of foundation, and chain-of-custody issues.[2] The trial court overruled these objections, stating that Anderson could "testify to his own independent results of what he's done." The trial court also ruled that a toxicology report pertaining to NMS Labs' testing of Gourley's blood could not be shown to the jury and admitted it for record purposes only.

When the jury returned, Anderson testified that Gourley's blood had tested positive for methamphetamine and amphetamine. He told the jury that Gourley's

[2]We will detail these objections more fully below in our discussion of Gourley's preservation (or lack thereof) of her first issue.

5

blood contained 190 nanograms of methamphetamine per milliliter and that it contained thirty-six nanograms of amphetamine per milliliter.

After hearing testimony from Hernandez, Sheffer, and Anderson, the jury found Gourley guilty of driving while intoxicated, and the trial court assessed her punishment and sentenced her as indicated above. This appeal followed.

## III. DISCUSSION

### A. Gourley's Confrontation Complaint

In her first issue, Gourley argues that the trial court "violated [her] constitutional right to confront the witnesses against her by allowing a surrogate analyst to introduce the blood test results obtained by the testing analyst."

#### 1. Gourley's Failure to Preserve Her Confrontation Complaint

In its brief, the State argues that Gourley failed to preserve her confrontation complaint because she did not raise it with the trial court. We thus turn to the question of whether Gourley has preserved this complaint.

##### a. Applicable Law

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223

6

(Tex. Crim. App. 2020). "Confrontation Clause complaints are subject to these preservation requirements." *Blackwell v. State*, No. 02-24-00040-CR, 2025 WL 52115, at \*2 (Tex. App.—Fort Worth Jan. 9, 2025, no pet. h.) (mem. op., not designated for publication) (citing *Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010)); *see Deener v. State*, 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. ref'd) ("We conclude the right of confrontation is a forfeitable right—not a waivable-only right—and must be preserved by a timely and specific objection at trial.").

"The two main purposes of requiring a specific objection are to inform the trial judge of the basis of the objection so that he has an opportunity to rule on it and to allow opposing counsel to remedy the error." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). While preservation does not require "magic language," it turns on whether the trial court understood the basis of the objection. *State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013). An objection preserves only the specific ground cited. *See* Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1)(B); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g).

Moreover, the complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark*, 365 S.W.3d at 339; *see Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."). To determine whether the complaint on appeal comports to that made at trial, we consider the context in which the complaint was made and

7

the parties' shared understanding at that time. *Clark*, 365 S.W.3d at 339; *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009).

### b. Gourley's Objections to Anderson's Testimony

We now detail Gourley's objections to Anderson's testimony to see whether her complaints on appeal comport with the complaints she raised below.

In the jury's presence, Anderson was asked to testify regarding the results of NMS Labs' testing of Gourley's blood. Gourley's counsel objected, stating, "I'm going to object. I don't think there's a proper predicate laid for this at this time, for offering the results." The trial court sustained the objection. The State then sought to prove up the chain of custody pertaining to NMS Labs' testing of Gourley's blood, offering to admit certain custody logs into evidence. Gourley's counsel objected to the admission of those exhibits, stating, "I don't think these are proper without the actual predicate being laid that [Anderson] was the person who signed in, signed out the blood, whether the blood is attached to this particular defendant. I think the predicate is lacking. There's no foundation for this." The jury was removed from the courtroom, and the trial court sustained the objection.

Outside the jury's presence, the State also moved to admit a toxicology report pertaining to NMS Labs' testing of Gourley's blood for record purposes only. Gourley's counsel stated, "I'm going to renew my objection. . . . [T]he State is required to show a chain of custody between the nurse and the ultimate lab, and there's no testimony whatsoever that the blood tested is one and the same as that

8

which was drawn. There's been no chain of custody established." After further argument from both parties regarding the chain-of-custody issue, the trial court stated, "[S]o currently I'm going to sustain the objection."

Anderson then explained to the trial court how Gourley's blood was received, stored, and tracked by NMS Labs during the testing process. The State then asked, "Your Honor, may this witness proceed now with testimony regarding blood results in this case?" Gourley's counsel then took Anderson on voir dire, asking him questions regarding his personal knowledge regarding what had happened to Gourley's blood at NMS Labs. At the conclusion of that exchange, Gourley's counsel stated,

> I'll renew my objection, Your Honor. It's an improper chain. There's no connection, an insufficient connection at the very least to show that the blood sampled was the same as the blood tested. We're going basically off hearsay, computer-generated records of which he had no part in inputting or viewing the samples, tubes, markings, names, or packaging. It's insufficient. We object.

In response to the objection, the trial court stated, "I'm going to overrule you on chain of custody. I'm going to give you a minute . . . if you've got another objection to make." Gourley's counsel replied,

> Chain of custody overruled, okay. My objection then is that he had not tested the blood himself. He has no personal knowledge, and he's basing his opinions on hearsay generated from a computer that he did not enter the information into. He cannot testify to the validity of it or that the blood tested was one and the same from Ms. Gourley, and on that basis there's insufficient foundation for his testimony about the results.

9

And again, we don't have the results here to even, you know, look and see whether it was in fact one and the same. He did not enter it. He has not seen it. All he has done is evaluated a report that was generated.

The State asked Anderson more questions, outside the jury's presence, regarding his role in testing Gourley's blood. During that exchange, Anderson stated that two other individuals employed by NMS Labs had tested Gourley's blood but that he had conducted his own analysis of the analytical data from that testing and had formed his own conclusions from the data. Anderson averred, "[M]y report is my own conclusions drawn from analytical data, period. It's my own conclusions whether Joe Blow ran it or John Smith ran it."

The State then moved to admit the toxicology report for record purposes only. Gourley's counsel asked whether he could renew his objections, and the trial court asked him to "restate [his] objections one at a time." Gourley's counsel stated,

> Well, the first objection is, we don't know – the chain of custody starts with the nurse, and it went to NMS Labs at some point. We don't know anything about who got it, put the information into the computer, whether that's accurate. There's no – there's no indication that this witness can testify that the blood that we're talking about today belonged to Ms. Gourley.

The trial court responded, "On chain of custody[,] I'm going to overrule you. State your next objection." Gourley's counsel replied, "There's no foundation because there's no blood to support the entry of the results." Gourley's counsel further argued,

> I don't think that this witness knows where the blood is at this point. He's got no personal knowledge. I know he's going off these computer-

10

generated things, and I understand he's left with that. But this is a big operation. That's not our burden. We don't know where it is.

That's purportedly where it is. There's nothing really showing how it got there, that it was the same blood, or anything like that. And without the actual blood being brought here and put into evidence to look at the actual markings, they have not laid the foundation to establish that that is one and the same blood that tested – that belonged to Ms. Gourley.

After hearing further argument from both sides on the issue, the trial court stated, "[The toxicology report] will come in for record purposes only. It's not going to be seen by the jury. [Anderson] can testify to his own independent results of what he's done. So your objections are going to be overruled at this point."

The jury was brought back into the courtroom, and Anderson testified that Gourley's blood had tested positive for methamphetamine and amphetamine. He told the jury that Gourley's blood contained 190 nanograms of methamphetamine per milliliter and that it contained thirty-six nanograms of amphetamine per milliliter.

### c. Analysis

Gourley's first issue is based on the Sixth Amendment's Confrontation Clause and her assertion that her confrontation rights were violated "by allowing a surrogate analyst to introduce the blood test results obtained by the testing analyst." *See* U.S. Const. amend. VI. However, this was not the objection made by Gourley at trial. At her trial, Gourley did not make any complaint based on the Sixth Amendment, the Confrontation Clause, her right to confront witnesses, or regarding Anderson being a "surrogate" analyst. Rather, as detailed above, Gourley's objections were based on

11

hearsay, lack of foundation, and chain-of-custody issues. Those objections raised below do not comport with her argument on appeal. *See Clark*, 365 S.W.3d at 339; *Lovill*, 319 S.W.3d at 691–92.

Accordingly, we hold that Gourley has not preserved her confrontation complaint because she did not raise that complaint with the trial court. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) ("When a defendant's objection encompasses complaints under both the Texas Rules of Evidence and the Confrontation Clause, the objection is not sufficiently specific to preserve error."); *Bin Fang v. State*, 544 S.W.3d 923, 930 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that appellant's "hearsay objections did not preserve error for his complaint on appeal concerning the Confrontation Clause"); *Carter v. State*, No. 01-16-00799-CR, 2017 WL 4682187, at *3 (Tex. App.—Houston [1st Dist.] Oct. 19, 2017, pet. ref'd) (mem. op., not designated for publication) (holding that appellant did not preserve his confrontation complaint because he did not refer to the Confrontation Clause as a basis for admitting exhibit or as a basis for questioning the complainant about it); *Thomas v. State*, No. 08-14-00095-CR, 2015 WL 6699226, at *3–5 (Tex. App.—El Paso Nov. 3, 2015, pet. ref'd) (not designated for publication) (holding that objections based on authentication, chain of custody, and Rule 702 did not preserve appellant's confrontation complaint); *Casas v. State*, No. 13-12-00676-CR, 2014 WL 1633122, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 24, 2014, pet. ref'd) (mem. op., not designated for publication) (holding that appellant's objection that the State's evidence

lacked a "proper foundation" did not preserve appellant's complaint under the Confrontation Clause); *Mitchell v. State*, 238 S.W.3d 405, 409 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that appellant's hearsay objection did not preserve error on his confrontation complaint and noting that "[h]earsay objections and objections to violations of the constitutional right to confront witnesses are neither synonymous nor necessarily coextensive").

## 2. The Merits of Gourley's Confrontation Complaint

Even assuming that Gourley had preserved her confrontation complaint, we would nevertheless reject it on the merits.

### a. Standard of Review

While we typically review a trial court's decision to admit or exclude evidence for an abuse of discretion, *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018), we review a trial court's determination of a Confrontation Clause objection de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006); *Kelley v. State*, No. 02-23-00296-CR, 2024 WL 3196072, at *3 (Tex. App.—Fort Worth June 27, 2024, no pet.) (mem. op., not designated for publication).

### b. Applicable Law

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *see Smith v. Arizona*, 602 U.S. 779, 783, 144 S. Ct. 1785, 1791

13

(2024). Once a defendant raises a Confrontation Clause objection, the burden shifts to the State to establish that either (1) the proposed statement does not contain testimonial hearsay and thus does not implicate the Confrontation Clause or (2) the statement does contain testimonial hearsay but is nevertheless admissible. *See De La Paz v. State*, 273 S.W.3d 671, 680–81 (Tex. Crim. App. 2008). "[T]estimonial statements are those 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 52, 124 S. Ct. 1354, 1364 (2004)).

In *Downing v. State*, we summed up the law regarding the intersection between the Confrontation Clause, forensic lab reports, and testimony regarding scientific forensic analysis. No. 02-19-00385-CR, 2020 WL 5833631, at *3 (Tex. App.—Fort Worth Oct. 1, 2020, no pet.) (mem. op., not designated for publication). As we explained,

> The Confrontation Clause prohibits the admission of out-of-court testimonial statements made by a witness who does not appear at trial unless she is unavailable and the defendant had a prior opportunity to cross-examine her. *Crawford*[ ], 541 U.S. [at] 53–54[, 124 S. Ct. at 1365]. Because forensic lab reports are testimonial, the Confrontation Clause applies to their admission. *Bullcoming v. New Mexico*, 564 U.S. 647, 652[, 131 S. Ct. 2705, 2710] (2011). Thus, the admission of a forensic lab report created solely by a nontestifying scientist violates the Confrontation Clause. *Paredes v. State*, 462 S.W.3d 510, 517 (Tex. Crim. App. 2015). The Confrontation Clause is also offended by an expert's merely explaining a nontestifying scientist's report when the expert has no personal knowledge of how the testing was conducted even though familiar with how the analysis is customarily performed. *Id.* However,

14

> an expert's testimony based on a scientific forensic analysis that was performed by a nontestifying scientist is admissible if (1) the expert independently analyzes the data generated by the nontestifying scientist and develops her own conclusions from the data and (2) the lab report created by the nontestifying scientist is not offered into evidence. *Id.* at 517–18.

*Downing*, 2020 WL 5833631, at *3.

### c. Analysis

In her brief, Gourley points us to *Bullcoming* to support her argument that the trial court erred by allowing Anderson to testify regarding the presence of drugs in Gourley's blood. In *Bullcoming*, the appellant appealed his conviction for driving while intoxicated after a forensic laboratory report analyzing his blood was admitted at trial and sponsored by a forensic scientist who was not the scientist who had conducted the testing and certified the results. 564 U.S. at 653–57, 131 S. Ct. at 2711–12. Notably, the testifying scientist did not give any independent opinion concerning the appellant's blood-alcohol content. *Id.* at 662, 131 S. Ct. at 2716. The United States Supreme Court considered the question of "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Id.* at 652, 131 S. Ct. at 2710. The Court held that "surrogate testimony of that order does not meet the constitutional requirement," stating that "[t]he accused's right is to be confronted with the analyst

15

who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.*, 131 S. Ct. at 2710.

In its brief, the State points us to *Downing*. In *Downing*, the appellant appealed her conviction for driving while intoxicated, arguing that her confrontation rights were violated when Hay, the forensic scientist who had performed the gas-chromatography testing on her blood sample, was unavailable as a witness at her trial, and a different forensic scientist at Hay's lab—Eckelkamp—performed a technical review of the forensic lab report. 2020 WL 5833631, at *1. In reviewing that issue, we noted that the forensic lab report had not been admitted into evidence at Downing's trial. *Id.* at *3. We also stated that Eckelkamp "was not a mere conduit or surrogate through which Hay's conclusions could be admitted." *Id.* Rather, Ecklelkamp had "reviewed the nontestimonial raw data produced by the gas-chromatography test, verified the accuracy of the data, and explained her role in the testing process." *Id.* (internal footnote omitted). We noted that Eckelkamp was subject to cross-examination for the bases for her conclusions and the accuracy of the testing process and summed up our holding as follows:

> Eckelkamp performed an independent review of the raw data produced by the gas-chromatography testing of Downing's blood specimen. Because this review was not a mere regurgitation of Hay's conclusion from the same raw data and because the forensic lab report was not admitted into evidence, the admission of Eckelkamp's testimony did not violate Downing's confrontation rights.

16

*Id.*

Here, like the circumstances in *Downing* and unlike the circumstances in *Bullcoming*, the toxicology report was not shown to the jury. *Compare Downing*, 2020 WL 5833631, at *3 ("Here, the forensic lab report was not admitted into evidence."), *with Bullcoming*, 564 U.S. at 656, 131 S. Ct. at 2712 (noting that the trial court had admitted the laboratory report into evidence). Moreover, like the testifying scientist in *Downing* and unlike the testifying scientist in *Bullcoming*, here, Anderson reviewed the raw data and opined about the results of the testing based upon his own review of the raw data. *Compare Downing*, 2020 WL 5833631, at *2 ("Eckelkamp testified that her independent review of the raw data produced by the gas-chromatography testing led her to conclude that Downing's blood-alcohol concentration had been 0.136."), *with Bullcoming*, 564 U.S. at 662, 131 S. Ct. at 2716 (noting that the State did not assert that the testifying scientist had any "independent opinion" concerning Bullcoming's blood-alcohol concentration).

Accordingly, we hold that the admission of Anderson's testimony did not violate Gourley's confrontation rights because the toxicology report was not admitted into evidence and because Anderson had performed an independent review of the raw data from the testing and formed his own conclusions from that data. *See Downing*, 2020 WL 5833631, at *3; *Henderson v. State*, No. 02-15-00397-CR, 2017 WL 4172591, at *18 (Tex. App.—Fort Worth Sept. 21, 2017, pet. ref'd) (mem. op., not designated for publication) (distinguishing *Bullcoming* and holding that appellant's confrontation

17

rights were not violated when "the testifying experts merely utilized others' lab reports as the raw data in forming their own expert opinions").[3]

We overrule Gourley's first issue.

## B. Gourley's Complaint Regarding the $100 Fine

In her second issue, Gourley argues that the trial court erred by imposing the $100 fine under Article 102.0185 because the fine was not orally pronounced in her presence. The State candidly agrees. So do we.

A fine is punitive in nature and is part of a defendant's sentence; as such, fines must be pronounced orally in the defendant's presence. *Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011); *see also* Tex. Code Crim. Proc. Ann. art. 42.03, § 1(a)

---

[3]In their respective briefs, both parties cite *Smith*, a recent United States Supreme Court opinion addressing the interplay between the Confrontation Clause and scientific testing of evidence. 602 U.S. at 779, 144 S. Ct. at 1785. In *Smith*, the defendant was found by police with what appeared to be large quantities of drugs. *Id.* at 789, 144 S. Ct. at 1795. An analyst who tested the substances did not testify at trial. *Id.* at 790, 144 S. Ct. at 1795. Instead, a different analyst reviewed the lab report and the first analyst's notes, referred to those materials at trial, conveyed what the documents said, and opined about the chemical nature of the substances based on the first analyst's records. *Id.* at 791, 144 S. Ct. at 1795–96. The Court held that the testifying analyst testified to the truth of the first analyst's report, noting that the testifying analyst's opinions "were predicated on the truth of [the first analyst's] factual statements" and that the testifying analyst "could opine that the tested substances were [drugs] only because he accepted the truth of what [the first analyst] had reported about her work in the lab." *Id.* at 798, 144 S. Ct. at 1799. This raised concerns under the Confrontation Clause because the testifying analyst's opinion "would have counted for nothing" if the first analyst "had lied about all those matters." *Id.*, 144 S. Ct. at 1800. We find *Smith* distinguishable because, here, Anderson was not merely relying on the truth of other analysts' opinions; rather, he formed his own conclusions based upon his review of the raw data.

18

(providing that "sentence shall be pronounced in the defendant's presence"). When there is a conflict between the oral pronouncement of a sentence and the written judgment, the oral pronouncement controls. *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004).

Here, notwithstanding the fact that Article 102.0185(a) states that the defendant "shall" pay a $100 fine on conviction of an offense under Chapter 49 with two exceptions not relevant here, *see* Tex. Code Crim. Proc. Ann. art. 102.0185(a), the trial court did not orally pronounce the $100 fine that is included in the trial court's judgment. Thus, we sustain Gourley's second issue and modify the trial court's judgment to delete the $100 fine. *See Armstrong*, 340 S.W.3d at 767; *Taylor*, 131 S.W.3d at 500; *Wells v. State*, No. 08-23-00098-CR, 2023 WL 8793051, at *1 (Tex. App.—El Paso Dec. 19, 2023, no pet.) (mem. op., not designated for publication) (modifying judgment to delete $100 fine when said fine was not assessed by the jury or orally pronounced by the trial court); *Aburu v. State*, No. 02-23-00089-CR, 2023 WL 8643039, at *1 (Tex. App.—Fort Worth Dec. 14, 2023, no pet.) (mem. op., not designated for publication) (same).

## IV. CONCLUSION

Having overruled Gourley's first issue but having sustained her second issue, we modify the judgment to delete the $100 fine, and we affirm the trial court's judgment as modified.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 6, 2025